IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:14-CV-186-D

| | |
|---|---|
| SAUL HILLEL BENJAMIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NICHOLAS SPARKS, et al., | ) |
| | ) |
| Defendants, | ) |

**ORDER**

On October 2, 2014, Saul Hillel Benjamin ("plaintiff" or "Benjamin") filed suit against The

Epiphany School of Global Studies ("Epiphany"), Nicholas Sparks Foundation ("Foundation"),

Nicholas Sparks ("Sparks"), Melissa Blackerby ("Blackerby"), Tracey Lorentzen ("Lorentzen"), and

McKinley Gray ("Gray") (collectively, "defendants"). Compl. [D.E. 1] 1. Benjamin alleged 19

claims under state and federal law arising out of his former employment as headmaster of Epiphany

and as a Foundation contractor. Id. ¶¶ 119–218. On December 19, 2014, defendants moved (in two

separate motions) to dismiss the complaint. See [D.E. 19, 20]. On February 23, 2015, Benjamin

moved to amend his complaint [D.E. 32]. On May 22, 2015, the court granted Benjamin leave to

amend his complaint [D.E. 51]. On May 28, 2015, Benjamin filed an amended complaint asserting

16 claims for relief. See Am. Compl. [D.E. 51] ¶¶ 119–204.

On June 11, 2015, defendants moved to dismiss the amended complaint for failure to state

a claim upon which relief can be granted. See [D.E. 54, 55] (motion to dismiss and accompanying

memorandum filed by Epiphany, Nicholas Sparks in his official capacity, Tracey Lorentzen, Melissa

Blackerby, and McKinley Gray); [D.E. 56, 57] (motion to dismiss and accompanying memorandum

filed by Nicholas Sparks in his individual capacity and the Foundation). Benjamin responded [D.E. 58, 59], and defendants replied [D.E. 61, 62]. As explained below, the court grants defendants' motions to dismiss and dismisses claims one and two against Blackerby, Lorentzen, and Gray, claims five, twelve, thirteen, claim fourteen against Gray and Lorentzen, and claim sixteen. Blackerby, Lorentzen, and Gray are dismissed as defendants in this action.

I.

In 2006, Sparks founded Epiphany, a private, co-educational school. Am. Compl. ¶¶ 2, 14. Defendants Blackerby, Lorentzen, Gray, and Sparks are members of Epiphany's Board of Trustees (the "Board"), and Sparks serves as chair of the Board. Id. ¶¶ 16–19. The Foundation is a non-profit corporation that supports Epiphany. See id. ¶ 15.

In February 2013, Epiphany hired Benjamin as its headmaster and CEO. Id. ¶¶ 20–22. Benjamin signed an employment agreement with Epiphany and also received additional compensation pursuant to an independent contractor agreement with the Foundation. See id. ¶ 20.

While recruiting Benjamin, Sparks told Benjamin that Sparks expected Benjamin to improve Epiphany, "tak[ing] our little school and mak[ing] it amazing, global, and open-hearted." Id. ¶ 24. Benjamin "embarked upon an ambitious agenda" to accomplish this goal, beginning "an innovative curricular initiative" for Epiphany's high school, implementing a new decisionmaking system, and proposing to the Board a new, comprehensive policy statement regarding non-discrimination. Id. ¶¶ 25–26. To remedy what he perceived to be a lack of diversity at Epiphany, Benjamin advocated hiring qualified African-American faculty and staff and personally recruited Epiphany's first African-American full-time faculty member. Id. ¶¶ 32–33. Benjamin also organized a student trip to Washington, D.C., to observe the 50th anniversary of the 1963 civil rights march and used the opportunity to discuss racial diversity at Epiphany. See id. ¶ 35.

2

Benjamin began to receive criticism from some Board members for his efforts to increase diversity. Sparks and Gray told Benjamin that some of his actions were "provocative" and, in late November 2013, Sparks specifically told Benjamin "not to criticize Ms. Janet Foley, Epiphany's Director of Admissions, for her failure to . . . recruit or enroll African-American students." Id. ¶¶ 34, 36. Benjamin also alleges that members of the Board, including Gray and Lorentzen, "openly displayed contempt for [his] Jewish ethnicity. For example, . . . [after hearing Benjamin refer to 'the Rabbi Jesus' when reading original Hebrew and Greek sources of the New Testament], Lorentzen and Gray warned Mr. Benjamin, 'Don't ever refer to Jesus Christ as a Rabbi!'" Id. ¶ 37.

When Benjamin tried to protect students from bullying based on their sexual orientation and sexual identity, some Board members "demonized" his efforts. Id. ¶¶ 38–41. Specifically, in October 2013, a group of students began a club to discuss sexual identity and sexual orientation. Id. ¶ 38. When other students learned of the club, student bullying occurred. Id. ¶¶ 39–40. When Benjamin and Epiphany's deputy headmaster began to investigate the student bullying, members of the Board undermined their efforts, prohibiting students from discussing sexual identity or sexual orientation. Id. ¶ 41. Sparks asked Benjamin, "What's with this gay club?" and told Benjamin to stop supporting the bullied students. Id. More generally, Board members did not support other faculty members who supported the bullied students. Lorentzen and Blackerby threatened several faculty members with dismissal if they continued to support the bullied students and threatened legal action if the faculty members complained about the dismissal threats. Id. ¶ 42. Lorentzen and Blackerby also threatened a bisexual teacher with dismissal if she publically supported the students. Id.

On October 29, 2013, Sparks asked Benjamin not to talk about "Islam, Judaism, or any other non-Christian religion at any Epiphany function." Id. ¶¶ 43–44. He also spoke to Benjamin about

3

attending a local event keynoted by a member of the NAACP, telling Benjamin that several parents of children at Epiphany had raised concerns about his attendance at the event. Id. ¶¶ 45–47. Sparks told Benjamin that, if he wished to contact African-American parents to encourage their children to apply to Epiphany, he should use other, less public, means. Id. At the same meeting, Sparks told Benjamin to keep discussions about homosexuality or sexual identity out of larger discussions of diversity at Epiphany. Id. ¶ 48. Finally, Sparks asked Benjamin to hire as Epiphany's school chaplain a "true Christian," specifically excluding any Quaker, Mormon, Seventh Day Adventist, or Jehovah's Witness candidates. Id. ¶ 49.

On October 30, 2013, the Board pressured Benjamin to "stop supporting students who had been bullied based on their sexual identities." Id. ¶ 50. Gray accused Benjamin of "promoting a homosexual culture and agenda" through his behavior and accused him of breaching his employment contract by doing so. Id. Blackerby and Lorentzen agreed. Id.

On November 9, 2013, at a dinner party, several parents expressed doubt that Benjamin would hire a "true Christian" as Epiphany's chaplain because of Benjamin's Jewish ethnicity and Quaker religious beliefs. See id. ¶¶ 4, 52. Sparks later told Benjamin that some parents "will never trust [Benjamin] because of who [Benjamin is.]" Id. ¶ 53. On November 16, 2013, Lorentzen and Cathy Sparks (Sparks's wife and a Board member) visited Benjamin's home, asked him a series of "offensive and invasive questions about his religious beliefs," reiterated that he should hire a "true Christian as chaplain," and demanded that Benjamin stop discussing diversity. Id. ¶¶ 54–58. In November, Sparks also wrote to Benjamin and stated that Epiphany's new comprehensive anti-discrimination policy was unnecessary. Id. ¶ 60. On November 19, 2013, because Benjamin's "efforts to foster diversity had led the Board to question the acceptability of his religious beliefs," the Board held a public forum. Id. ¶ 61. At the public forum, Benjamin gave a verbal account of

4

his religious beliefs (an act which Benjamin found antithethical to his Quaker beliefs) and explained the influence of his Jewish heritage and ethnicity on those views. Id. ¶¶ 62–63. Gray then solicited comments about Benjamin from the audience members, and the Board, including Sparks, Lorentzen, Blackerby, and Gray, applauded Benjamin's "public pillorying." Id. ¶¶ 64–66.

On November 21, 2013, Benjamin met with Sparks, Lorentzen, and Gray in a conference room at Epiphany. Id. ¶¶ 69–70. Sparks initially told Benjamin he was being fired "for Cause from the Foundation." Id. ¶ 71. Sparks then insisted that Benjamin sign a letter of resignation from Epiphany or be terminated "for Cause." Id. ¶ 73.[1] Benjamin asked for time to think about the demand, but he "was told to sign immediately." Id. ¶ 74. Sparks, Gray, and Lorentzen told Benjamin "that he would not be allowed to leave the room, even to use the restroom . . . until he signed." Id. Benjamin asked to speak with a lawyer, but Gray refused. Id. Benjamin asked for his special assistant to join the meeting, but the Board refused. Id. ¶ 75. Benjamin asked for his wife to join the meeting, and the Board initially denied this request as well but eventually allowed Benjamin's wife to join the group in the conference room. Id. Throughout the meeting, Sparks "berated" Benjamin, "acted in a loud, ranting, and physically intimidating manner," and "physically intimidated Mr. Benjamin." Id. ¶¶ 70–78. Benjamin, "[f]earing for his and his wife's safety," agreed to sign a letter of resignation. Id. ¶¶ 76–77. Sparks and Gray dictated the letter to Benjamin, who transcribed their words and signed his name. Id.

After Benjamin left, Sparks told Benjamin's wife that Benjamin had been terminated due to a purported mental illness, was "unfit to work and would never again hold another full-time job,"

---

[1] Benjamin also alleges that "Defendant Sparks cancelled his contract [with the Foundation] on November 22, 2013[,] when Foundation Board of Directors member[] Emily Sweet[] emailed Mr. Benjamin to inform him that he was being terminated for some unspecified 'act of fraud or dishonesty.'" Id. ¶ 116.

and should be "placed in a residential care facility to receive treatment." Id. ¶¶ 79–80. Sparks and other Board members told members of the community that Benjamin's employment ended because Benjamin suffered from a mental illness. Id. ¶ 81. Sparks also repeated this story to Tom Plihcik, a "nationally respected education-industry recruiter with whom Mr. Benjamin had successfully worked in the past." Id. ¶ 91. Plihcik had, upon initially learning of Benjamin's termination, "earnestly proposed Mr. Benjamin's candidacy for two career opportunities at the Carolina Day School in Asheville, North Carolina, and Jackson Preparatory School in Jackson, Mississippi." Id. After learning of Benjamin's supposed mental illness, however, Plihcik withdrew his support for Benjamin. Id.

After Benjamin's termination, Sparks asked Benjamin to sign a release waiving any anti-discrimination claims. Id. ¶ 89. When Benjamin refused, Sparks raised the rent on, temporarily put up for sale, and ultimately revoked the lease for the house that Epiphany had provided to Benjamin and his family, forcing them to move. Id. When Benjamin retained counsel, Gray threatened that Sparks "would take prompt legal action" against Benjamin if Benjamin pursued his claims. Id. ¶ 90.

On October 2, 2014, Benjamin filed suit in federal court. See Compl. 1. Benjamin asserts sixteen claims in his amended complaint. He alleges discrimination and harassment on the basis of his Jewish race in violation of section 1981 against all defendants (claim 1), retaliation in violation of section 1981 against all defendants (claim 2), religious discrimination in violation of Title VII against Epiphany (claim 3), race discrimination in violation of Title VII against Epiphany (claim 4), national origin discrimination in violation of Title VII against Epiphany (claim 5), disability discrimination in violation of the Americans with Disabilities Act against Epiphany (claim 6), retaliation in violation of Title VII against Epiphany (claim 7), breach of contract against Epiphany (claim 8), breach of contract against the Foundation (claim 9), defamation per se against Sparks

6

(claim 10), defamation against Sparks (claim 11), tortious interference with prospective economic relations against Sparks (claim 12), tortious interference with a contract against Sparks and Epiphany (claim 13), false imprisonment against Sparks, Gray, and Lorentzen (claim 14), assault against Sparks (claim 15), and retaliation in violation of the North Carolina School Violence Prevention Act against all defendants (claim 16). See Am. Compl. ¶¶ 119–204. Defendants move to dismiss claim 1 and claim 2 as to Blackerby, Lorentzen, and Gray, claim 5, claim 12, claim 13, and claim 14 as to Gray and Lorentzen, and claim 16. See [D.E. 54, 55, 56, 57]; see also Fed. R. Civ. P. 12(b)(6).

II.

A motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted" tests the legal and factual sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); accord Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (per curiam). The court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). The court need not, however, accept as true a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Id.

In evaluating a motion to dismiss, the court looks to the complaint and materials attached to the complaint. Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007); Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004). The court also may consider "documents incorporated into the complaint by reference, and matters of which a court may take

7

judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see In re PEC Sols., Inc. Sec. Litig., 418 F.3d 379, 388 n.7 (4th Cir. 2005); Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656–57 (4th Cir. 2004).

## III.

In claim one, Benjamin alleges that defendants discriminated against him and harassed him based on his Jewish race in violation of 42 U.S.C. § 1981. Am. Compl. ¶¶ 119–23. Defendants Blackerby, Lorentzen, and Gray move to dismiss, arguing that Benjamin has not plausibly alleged a section 1981 claim against them individually.

Section 1981 provides a cause of action against private parties who deprive others of the power to make and enforce contracts on the basis of race. See 42 U.S.C. § 1981; Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459–60 (1975). The Supreme Court has held that "Jews are considered to be a separate race" under section 1981. See Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 617 (1987); Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609–13 (1987). Purposeful, racially discriminatory actions that impair an employment contract violate section 1981. See, e.g., Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 & n.7 (4th Cir. 2002); Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018–19 (4th Cir. 1999); Pearsall v. Child Advocacy Comm'n of Lower Cape Fear, Inc., No. 7:98 CV 200 BR, 2000 WL 33682693, at *6–7 (E.D.N.C. Feb. 15, 2000) (unpublished).

## A.

Benjamin's amended complaint does not reference any direct evidence of race discrimination. Instead, he proceeds under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); see

8

Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543–45 (4th Cir. 2003) (applying the McDonnel Douglas framework to section 1981 claims); Bryant, 288 F.3d at 133 & n.7 (same); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 603–04 (E.D.N.C. 2006) (same); see also CBOCS W., Inc. v. Humphries, 553 U.S. 442, 450–57 (2008) (discussing "overlap" between section 1981 and Title VII). First, a plaintiff must establish a prima facie case of discrimination. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981); McDonnell Douglas, 411 U.S. at 802 & n.13; Miles v. Dell, Inc., 429 F.3d 480, 485–89 (4th Cir. 2005). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the defendant took an adverse employment action "for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254. This burden is one of production, not persuasion. St. Mary's Honor Ctr., 509 U.S. at 509–11. If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Burdine, 450 U.S. at 256; King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can demonstrate pretext by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted).

"While individual liability cannot attach to individual members of the Board of Directors under Title VII, the Directors may be liable for violations of § 1981 if they have intentionally discriminated against plaintiff." Pearsall, 2000 WL 33682693, at *6. "[P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." Patterson v. Cty. of Oneida,

9

375 F.3d 206, 229 (2d Cir. 2004) (quotation omitted) (alteration in original); see Hawthorne v. Va. State Univ., 568 F. App'x 203, 204–05 (4th Cir. 2014) (per curiam) (unpublished). "[A] plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action . . . ." Hawthorne, 568 F. App'x at 204–05 (quotation omitted). For example, individual supervisors may be held liable under section 1981 if they intentionally cause an employer to discriminate based on race. See, e.g., Alexander v. City of Greensboro, 762 F. Supp. 2d 764, 790–92 (M.D.N.C. 2011); Carson v. Giant Food, Inc., 187 F. Supp. 2d 462, 483 (D. Md. 2002) ("Directors or managers can be held personally liable when they intentionally cause a corporation to infringe the rights secured by section 1981," but cannot be held liable when there is no evidence that they "directed, participated in or even approved of intentional discrimination" (quotations omitted)), aff'd sub nom., Skipper v. Giant Food Inc., 68 F. App'x 393 (4th Cir. 2003) (per curiam) (unpublished).[2] Section 1981, however, imposes liability on an individual only for his or her own intentional actions that cause an infringement of section 1981. See, e.g., Luy v. Balt. Police Dep't, 326 F. Supp. 2d 682, 688 (D. Md. 2004), aff'd, 120 F. App'x 465 (4th Cir. 2005) (per curiam) (unpublished); Tibbs v. Balt. City Police Dep't, Civil Action No. RDB-11-1335, 2012 WL 3655564, at *6 (D. Md. Aug. 23, 2012) (unpublished); Pearsall, 2000 WL 33682693, at *6 (collecting cases).

In analyzing whether a plaintiff has plausibly alleged sufficient individual action to allow

---

[2] Benjamin purports to sue Blackerby, Lorentzen, Gray, and Sparks in their "official and individual capacities." See Am. Compl. 1. As the defendants correctly note, private "individuals . . . cannot be sued in their 'official capacities' [because] these claims are reserved for individuals of governmental entities." [D.E. 55] 5 n.1; cf. Printz v. United States, 521 U.S. 898, 930–31 (1997) (contrasting actions taken as a "private citizen" and those taken in an "official capacity" as a state officer); Revene v. Charles Cty. Comm'rs, 882 F.2d 870, 873 n.3 (4th Cir. 1989) (same). Alternatively, an action against a person in his "official capacity" constitutes an action against the entity that employs the person. See Kentucky v. Graham, 473 U.S. 159, 166 (1985). Thus, actions against each defendant in his or her "official capacity" simply restate Benjamin's claims against Epiphany or the Foundation.

a section 1981 claim to proceed, courts may examine whether the individual defendant had the capacity to terminate the plaintiff's employment. See, e.g., Carson, 187 F. Supp. 2d at 483. Courts also may examine whether plaintiff plausibly alleges direct evidence of the defendant's racially discriminatory animus and shows that the individual defendant took part in the adverse employment action. See, e.g., Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1038 (9th Cir. 2005).

Benjamin's section 1981 race discrimination claim against defendants Blackerby, Lorentzen, and Gray fails. Benjamin has not plausibly alleged that these individual Board members had the individual authority to terminate Benjamin's employment. Likewise, Benjamin has not plausibly alleged that Blackerby, Lorentzen, or Gray intentionally acted to impair his employment contract. Similarly, Benjamin has not plausibly alleged any direct evidence that Blackerby, Lorentzen, or Gray exhibited discriminatory animus towards Benjamin because he was Jewish. Compare Am. Compl. ¶¶ 37, 54–58, 65–66, with Dominguez-Curry, 424 F.3d at 1038; cf. Proud v. Stone, 945 F.2d 796, 797–98 (4th Cir. 1991) (reasoning that "[f]rom the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job" and concluding that "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the ultimate question that discrimination did not motivate the employer" (citation and quotations omitted)). Thus, the court dismisses Benjamin's section 1981 race discrimination claim against defendants Blackerby, Lorentzen, and Gray. See McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585–88 (4th Cir. 2015).

B.

In claim one, Benjamin also alleges that Blackerby, Lorentzen, and Gray harassed him based upon his Jewish race and thereby violated section 1981. See Am. Compl. ¶¶ 119–23. To state a hostile work environment claim, Benjamin must plausibly allege that (1) he experienced unwelcome

11

harassment, (2) the harassment was based on his Jewish race, (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (4) the harassment was imputable to his employer. See Causey v. Balog, 162 F.3d 795, 801, 804 (4th Cir. 1998); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc) (listing similar elements for prima facie case for sexual harassment under Title VII). A "plaintiff [also] must demonstrate some affirmative link to causally connect the actor with the discriminatory action, and the claim must be predicated on the actor's personal involvement." Hawthorne, 568 F. App'x at 204–05 (quotations omitted).

Defendants Blackerby, Lorentzen, and Gray move to dismiss Benjamin's section 1981 hostile work environment claim. They contend that Benjamin has not plausibly alleged any conduct attributable to them that created a hostile work environment based on Benjamin's Jewish race. See [D.E. 55] 5–9; [D.E. 61] 1–2.

To be attributable to the defendants, conduct must either have been the action of a particular defendant or have been authorized or directed by them. See, e.g., Atkins v. Winchester Homes, Civil No. CCB-06-278, 2007 WL 269083, at *9 (D. Md. Jan. 17, 2007) (unpublished) ("Under Section 1981, individual supervisors must play an active role in the harassment to trigger liability."); Carson, 187 F. Supp. 2d at 483–84. Benjamin alleges the following actions attributable to Gray: (1) telling Benjamin that his efforts at increasing racial diversity were "provocative and therefore unwelcome," Am. Compl. ¶ 36; (2) telling Benjamin not to refer to Jesus as a Rabbi, id. ¶ 37; (3) accusing Benjamin of "promoting a homosexual culture and agenda," id. ¶ 50; (4) accusing Benjamin of breaking his contract by supporting students bullied due to their sexual orientation or sexual identity, id.; (6) soliciting grievances against Benjamin at the public forum, id. ¶ 65; (7) applauding statements made by parents at the public forum regarding Benjamin's religion, id. ¶¶ 65–66; (8)

12

being present at the meeting when Benjamin was fired, id. ¶ 70; (9) refusing to let Benjamin speak to a lawyer at the meeting when he was fired, id. ¶ 74; and, (10) dictating Benjamin's letter of resignation. Id. ¶ 77.

Benjamin alleges the following actions attributable to Lorentzen: (1) telling Benjamin not to refer to Jesus as a Rabbi, id. ¶ 37; (2) threatening other faculty with termination for supporting students bullied due to their sexual orientation or sexual identity, id. ¶ 42; (3) accusing Benjamin of breaking his contract by supporting students bullied due to their sexual orientation or sexual identity, id. ¶ 50; (4) asking offensive questions about Benjamin's religious beliefs and demanding that he hire a "true Christian" as chaplain, id. ¶¶ 54–58; (5) applauding statements made by parents at the public forum regarding Benjamin's religion, id. ¶¶ 65–66; and, (6) being present at the meeting when Benjamin was fired. Id. ¶ 70.

Benjamin alleges the following actions attributable to Blackerby: (1) threatening other faculty with termination for supporting students bullied due to their sexual orientation or sexual identity, id. ¶ 42; (2) accusing Benjamin of breaking his contract by supporting students bullied due to their sexual orientation or sexual identity, id. ¶ 50; and, (3) applauding statements made by parents at the public forum regarding Benjamin's religion. Id. ¶¶ 65–66.

The court assumes without deciding that the alleged actions based upon Benjamin's Jewish race were unwelcome and that those actions may be considered race-based under section 1981. The court focuses on whether Benjamin has plausibly alleged conduct that was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment.

To determine whether alleged harassment was sufficiently severe or pervasive to alter Benjamin's terms and conditions of employment and to create an abusive working environment, the court examines the allegations both subjectively and objectively. See, e.g, Harris v. Forklift Sys.,

13

Inc., 510 U.S. 17, 21–22 (1993). First, a plaintiff must subjectively consider the harassment to be sufficiently severe and pervasive as to alter the plaintiff's conditions of employment. See, e.g., Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc). Second, a court views the conduct from the perspective of a reasonable person in the plaintiff's position to determine whether it is objectively severe or pervasive. See, e.g., Faragher, 524 U.S. at 787–88; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); Boyer-Liberto, 786 F.3d at 277.

The objective component helps courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). The court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The conduct must be extreme to be actionable. Id.; Faragher, 524 U.S. at 787–88; see Boyer-Liberto, 786 F.3d at 277. Section 1981 does not create a general civility code in the workplace. See Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277. The "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277. "[D]iscriminatory intimidation, ridicule, and insult" based on race must "permeate[]" the work environment in a manner "sufficiently severe or pervasive to alter the conditions" of plaintiff's employment and "create an abusive working environment." Harris, 510 U.S. at 21 (quotations omitted). Simple teasing, sporadic abusive language, offhand comments, jokes related to protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53,

14

68–69 (2006); Faragher, 524 U.S. at 788; Boyer-Liberto, 786 F.3d at 277–81. Likewise, rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006); see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81; cf. Boyer-Liberto, 786 F.3d at 277–81; Walker v. Mod–U–Kraf Homes, LLC, 775 F.3d 202, 207–10 (4th Cir. 2014); Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli v. City of Balt., 648 F.3d 216, 218–22 (4th Cir. 2011); EEOC v. Xerxes Corp., 639 F.3d 658, 676–77 (4th Cir. 2011).

Benjamin's allegations concerning the conduct of Gray, Blackerby, and Lorentzen are not objectively severe or pervasive. Cf. Burlington N. & Santa Fe Ry., 548 U.S. at 68–69; Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Harris, 510 U.S. at 21; Xerxes Corp., 639 F.3d at 676–77; Bonds v. Leavitt, 629 F.3d 369, 385–86 (4th Cir. 2011); Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 336–37 (4th Cir. 2010). Although insensitive, the individual actions of Gray, Lorentzen, and Blackerby concerning Benjamin's Jewish race objectively do not constitute a change in the conditions of Benjamin's employment. Thus, the court dismisses Benjamin's section 1981 hostile work environment claim against defendants Blackerby, Gray, and Lorentzen.

C.

In claim two, Benjamin alleges that the defendants retaliated against him, in violation of section 1981. See Am. Compl. ¶¶ 124–28. Defendants Blackerby, Gray, and Lorentzen move to dismiss, arguing that Benjamin has not plausibly alleged a section 1981 retaliation claim against them. See [D.E. 55] 9–10.

Section 1981 provides a remedy not only for a person who claims race discrimination concerning a contract but also for a person claiming retaliation in response to complaining about a section 1981 violation. See, e.g., Humphries, 553 U.S. at 451; Boyer-Liberto, 786 F.3d at 281.

15

Benjamin's amended complaint contains no direct evidence of retaliation under section 1981, and Benjamin proceeds under the McDonnell Douglas burden-shifting framework. See, e.g., Boyer-Liberto, 786 F.3d at 281; Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004); Bryant, 333 F.3d at 543–45.

To establish a prima facie case of retaliation, a plaintiff must prove that (1) he engaged in protected activity, (2) his employer took an action against him which a reasonable employee would find materially adverse, and (3) the employer took the materially adverse employment action because of the protected activity. See Boyer-Liberto, 786 F.3d at 281–84; see also Burlington N. & Santa Fe Ry., 548 U.S. at 67–70; Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007); Honor, 383 F.3d at 188; Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). A retaliation claim requires "as an absolute precondition to suit that some adverse employment action have occurred." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985); see Boyer-Liberto, 786 F.3d at 281; James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004). The adverse employment action requirement recognizes that Congress did not intend section 1981 to "provide redress for trivial discomforts endemic to employment." Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999) (Title VII case). An adverse employment action is one that a reasonable employee would find materially adverse. See, e.g., Burlington N. & Santa Fe Ry., 548 U.S. at 67–70. The action must have a "tangible effect on the terms and conditions of employment." Thorn v. Sebelius, 766 F. Supp. 2d 585, 598 (D. Md. 2011) (quotation omitted) aff'd, 465 F. App'x 274 (4th Cir. 2012) (per curiam) (unpublished); see Holland, 487 F.3d at 219; James, 368 F.3d at 377; Boone, 178 F.3d at 256 .

Benjamin alleges that he engaged in protected activity by identifying, speaking against, and attempting to rectify racism at Epiphany. See Am. Compl. ¶ 88. He alleges that Blackerby, Gray,

16

and Lorentzen retaliated against him by publicly humiliating him concerning his Jewish heritage at the parent forum, that Gray and Lorentzen retaliated against him by confining him at the meeting when he was dismissed, and that Gray retaliated against him by threatening to take legal action against him after Benjamin's termination. See id. ¶¶ 28, 61–67, 69–78, 90; [D.E. 58] 15–18.

Benjamin has not plausibly alleged that the public humiliation at the parent forum had a tangible effect on the terms of his employment. See James, 368 F.3d at 377 (contrasting negative performance reviews that have a "tangible effect on the terms or conditions of employment" with those that "merely caus[e] a loss of prestige or status" and are not actionable (quotation omitted)); Boone, 178 F.3d at 256. Furthermore, Benjamin also has not plausibly alleged that the parent forum affected his pay, benefits, or other terms of employment. Moreover, Benjamin's alleged confinement at a meeting does not constitute adverse employment action. Likewise, Gray's alleged threat to take possible legal action after Benjamin's termination does not constitute adverse employment action. Cf. Burlington N. & Santa Fe Ry., 548 U.S. at 67–70; Holland, 487 F.3d at 219; James, 368 F.3d at 377; Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 531 (7th Cir. 2003); Boone, 178 F.3d at 256; Thorn, 766 F. Supp. 2d at 598. Thus, these actions do not qualify as adverse employment actions. Accordingly, the court dismisses Benjamin's section 1981 retaliation claim against defendants Blackerby, Gray, and Lorentzen.

D.

In claim five, Benjamin asserts a Title VII claim against Epiphany for discrimination based upon his Jewish national origin. Am. Compl. ¶¶ 139–43. "Title VII prohibits an employer from discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's national origin." Bryan v. Prince George's Cty., 484 F. App'x 775, 776 (4th Cir. 2012) (unpublished) (per

17

curiam) (quotation, alterations, and citation omitted); see Baqir, 434 F.3d at 742; see also 42 U.S.C. § 2000e–2(a)(1).

Epiphany moves to dismiss claim five, arguing that being "Jewish" is not a cognizable national origin under Title VII. See [D.E. 55] 10–11; [D.E. 61] 6–7. In Title VII, the term "national origin" facially refers to "the country where a person was born, or, more broadly, the country from which his or her ancestors came." Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973). When the text of a statute is clear on its face, a court need not look beyond the text to define a term therein. See, e.g., United States v. Woods, 134 S. Ct. 557, 567 n.5 (2013).

Benjamin does not plausibly allege discrimination based upon a country from which his ancestors came. Thus, he fails to state a national-origin claim under Title VII. See, e.g., Larson v. Portage Twp. Sch. Corp., No. 2:05 CV 431, 2006 WL 1660752, at *5 (N.D. Ind. June 14, 2006) (unpublished); Lapine v. Edward Marshall Boehm, Inc., No. 89 C 8420, 1990 WL 43572, at *5 (N.D. Ill. Mar. 28, 1990). Accordingly, the court grants Epiphany's motion to dismiss claim five.

E.

In claim twelve, Benjamin contends that Sparks tortiously interfered with his prospective economic relations, in violation of North Carolina state law. See Am. Compl. ¶¶ 181–86.[3] Sparks

---

[3] The court has supplemental jurisdiction over Benjamin's state law claims. See 28 U.S.C. § 1367(a). Because North Carolina law governs the state law claims, the court must predict how the Supreme Court of North Carolina would rule as to each disputed legal issue. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). If the state supreme court "has spoken neither directly nor indirectly on the particular issue before [the federal court, that court must] predict how [the state supreme] court would rule if presented with the issue." Id. (quotations omitted). In making that prediction, the court "may consider lower court opinions . . ., treatises, and the practices of other states." Id. (quotation omitted). Furthermore, in making its prediction, a federal court "should not create or expand a state's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alterations and quotation omitted); see Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

moves to dismiss claim twelve and argues that Benjamin's allegations do not state a claim for tortious interference with prospective economic relations under North Carolina law.

To state a claim for tortious interference under North Carolina law, a plaintiff must plausibly allege that (1) a prospective contract with a third party existed, (2) the tortfeasor "maliciously induc[ed]" the third party "not to enter a contract . . . which he would have entered into but for the interference," and (3) the interference proximately caused damages. Dalton v. Camp, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001) (quotation omitted); see Coleman v. Whisnant, 225 N.C. 494, 506–07, 35 S.E.2d 647, 655–56 (1945).

The first element requires a party to plausibly allege the existence of a prospective contract. See, e.g., Dalton, 353 N.C. at 654–55, 548 S.E.2d at 710; Coleman, 225 N.C. at 506–07, 35 S.E.2d at 655–56. A prospective contract exists when there is a reasonable expectation that the third party, but for the interference, would have entered into the contract. See, e.g., Owens v. Pepsi Cola Bottling Co. of Hickory, N.C. Inc., 330 N.C. 666, 680–81, 412 S.E.2d 636, 644–45 (1992); accord Dalton, 353 N.C. at 654–55, 548 S.E.2d at 710; Coleman, 225 N.C. at 506, 35 S.E.2d at 656. For example, in Owens, the plaintiff "show[ed] that he had a valid business relationship with several [specific customers], and that he had a reasonable expectation of continuing to do business with these customers." Owens, 330 N.C. at 680, 412 S.E.2d at 644–45. Conversely, when a plaintiff does not plausibly allege that the prospective contract would have been consummated but for the interference, a plaintiff fails to state a tortious interference claim. For example, in Spartan Equipment Co. v. Air Placement Equipment Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965), the Supreme Court of North Carolina affirmed dismissal of a tortious interference claim when the plaintiff did "not allege that [a] prospective sale to [a third party] would have been consummated but for the malicious interference of [the defendant]." Similarly, in Dalton, the Supreme Court of North

19

Carolina affirmed summary judgment for a defendant when the evidence showed that the plaintiff's contract negotiations with a third party had collapsed after a disagreement over terms and "such circumstances fail[ed] to demonstrate that a . . . contract would have ensued." Dalton, 353 N.C. at 655, 548 S.E.2d at 710.

Benjamin has not plausibly alleged the existence of a prospective contract with either Carolina Day School or Jackson Preparatory School. See Am. Compl. ¶ 91. Rather, he merely alleges that Plihcik, a recruiter, "had earnestly proposed Mr. Benjamin's candidacy for two career opportunities" at those schools. Id. Having one's name proposed, even "earnestly" and even by "a nationally respected education-industry recruiter," does not crate a reasonable expectation of the formation of an employment contract. See, e.g., Dalton, 353 N.C. at 655, 548 S.E.2d at 710; Spartan Equip. Co., 263 N.C. at 559, 140 S.E.2d at 11.

Benjamin also has not plausibly alleged the existence of a prospective contract with Plihcik. In fact, Benjamin does not allege that he and Plihcik had a contractual relationship at all. Rather, Benjamin merely suggests that Plihcik contracted with employers, not recruits. See Am. Compl. ¶ 91. Moreover, even if Benjamin's relationship with Plihcik did involve a contract, the relationship is not analogous to a repeated, regular business relationship for sale of goods. Simply put, Benjamin could not reasonably expect, based upon his relationship with Plihcik, that he would successfully consummate future contracts with Plihcik whenever he found himself looking for work. Compare Owens, 330 N.C. at 680, 412 S.E.2d at 644–45 (noting that plaintiff "could no longer fill orders from [the] local schools and factories" that regularly bought plaintiff's product), with Am. Compl. ¶¶ 91, 183–84, 186. Unlike repeated sales of goods to regular customers, Benjamin's having "successfully worked" with Plihcik does not reasonably create an expectation that Plihcik would enter into a contract with Benjamin following the termination of Benjamin's employment with Epiphany. Cf.

20

Dalton, 353 N.C. at 654–55, 548 S.E.2d at 710; Spartan Equip. Co., 263 N.C. at 559, 140 S.E.2d at 11. Thus, Benjamin has not stated a claim for tortious interference with prospective economic relations under North Carolina state law, and the court dismisses claim twelve.

F.

In claim thirteen, Benjamin contends that Sparks and Epiphany tortiously interfered with his contract with the Foundation. Am. Compl. ¶¶ 187–91, see id. ¶¶ 116–18. Sparks and Epiphany move to dismiss the claim.

To state a claim of tortious interference under North Carolina law, a plaintiff must plausibly allege "(1) a valid contract between the plaintiff and a third person . . . ; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). Parties who may interfere in contractual relations generally fall into two categories: outsiders to the contract and non-outsiders. An "outsider" is not party to the contract and has "no legitimate business interest of [his or her] own in the subject matter thereof." Smith v. Ford Motor Co., 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). Conversely, any party that "had a legitimate business interest . . . in the subject matter" is a "non-outsider." Id., 221 S.E.2d at 292. For example, non-outsiders to a contract include employees of an organization with whom the plaintiff has contracted. See, e.g., Embree Constr. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498–500, 411 S.E.2d 916, 924–25 (1992); Varner v. Bryan, 113 N.C. App. 697, 701–02, 440 S.E.2d 295, 298–99 (1994); Kingsdown, Inc. v. Hinshaw, No. 14 CVS 1701, 2015 WL 1441826, at *15 (N.C. Super. Ct. Mar. 25, 2015) (unpublished); Stec v. Fuzion Inv. Capital, LLC, No. 11 CVS 4241, 2012 WL 1524487, at *8 (N.C. Super. Ct. Apr. 30, 2012) (unpublished). Generally, acts of non-outsiders, such as officers of the employing organization, "are

21

presumed to have been done in the interest of the corporation" and are therefore "justified." Embree Constr. Grp., Inc., 330 N.C. at 498–99, 411 S.E.2d at 924–25. Thus, tortious interference claims against non-outsiders generally fail because plaintiffs cannot satisfy the fourth element of the tort. See id. at 498–99, 411 S.E.2d at 924–25; Wilson v. McClenny, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964); Privette v. Univ. of N.C. at Chapel Hill, 96 N.C. App. 124, 134–35, 385 S.E.2d 185, 191 (1989).

A plaintiff can overcome the presumption that a non-outsider's action was justified by showing that the non-outsider took the action for an improper reason. Embree Constr. Grp., Inc., 330 N.C. at 498, 411 S.E.2d at 924; Stec, 2012 WL 1524487, at *8. To do so, a plaintiff must show that the defendant acted with malice and for a reason "not reasonably related to the protection of a legitimate business interest." Sellers v. Morton, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008) (quotation omitted); Market Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 158, 520 S.E.2d 570, 581 (1999). However, merely alleging an improper actual or primary motive will not suffice. Instead, the "complaint must admit of no motive for interference other than malice." Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007); Filmar Racing, Inc. v. Stewart, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001); Privette, 96 N.C. App. at 135, 385 S.E.2d at 191; see Welch-Walker v. Guilford Cty. Bd. of Educ., No. 1:12 CV 149, 2014 WL 6997596, at *7 & n.5 (M.D.N.C. Dec. 10, 2014) (unpublished); Jones v. Am. Airlines, Inc., No. 5:08-CV-236-BR, 2008 WL 9411160, at *5 (E.D.N.C. Oct. 16, 2008) (unpublished).

Sparks was the chairman of the Foundation and had the power to terminate the Foundation's contract with Benjamin. See Am. Compl. ¶¶ 15–16, 116. In that supervisory role, Sparks had a legitimate business interest in the Foundation and in its staffing decisions. See, e.g., Privette, 96 N.C. App. at 134–35, 385 S.E.2d at 190–91; Kingsdown, Inc., 2015 WL 1441826, at *15; Stec, 2012

22

WL 1524487, at *8. Therefore, Sparks is a non-outsider to Benjamin's contract with the Foundation, and any actions Sparks took to cause the Foundation to terminate the contract carry a presumption of validity. See, e.g., Filmar Racing, Inc., 141 N.C. App. at 674–75, 541 S.E.2d at 738; Varner, 113 N.C. App. at 702, 440 S.E.2d at 298–99; Privette, 96 N.C. App. at 134–35, 385 S.E.2d at 190–91; see also Welch-Walker, 2014 WL 6997596, at *6–7. Similarly, Epiphany also is a non-outsider due to its unique business relationship with the Foundation. Benjamin has not plausibly alleged that Sparks or Epiphany intentionally interfered with Benjamin's Foundation contract solely for discriminatory or retaliatory purposes. See, e.g., Filmar Racing, Inc., 141 N.C. App. at 674–75, 541 S.E.2d at 738; Varner, 113 N.C. App. at 702, 440 S.E.2d at 298–99; Privette, 96 N.C. App. at 134–35, 385 S.E.2d at 190–91; see also Welch-Walker, 2014 WL 6997596, at *6–7. Likewise, Benjamin has not plausibly alleged the Epiphany intentionally induced the Foundation not to perform its contract with Benjamin. Thus, Benjamin fails to state a claim for tortious interference with a contract, and the court dismisses claim thirteen.

G.

In claim fourteen, Benjamin contends that Sparks, Gray, and Lorentzen falsely imprisoned him on November 21, 2013. Am. Compl. ¶¶ 69–79, 192–95. Defendants Gray and Lorentzen move to dismiss this claim against them.

Under North Carolina law, false imprisonment is "the illegal restraint of a person against his will." Hemric v. Groce, 169 N.C. App. 69, 78, 609 S.E.2d 276, 283 (2005) (quotation omitted); see Fowler v. Valencourt, 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993); Hales v. McCrory-McLellan Corp., 260 N.C. 568, 570, 133 S.E.2d 225, 227 (1963). To state a false imprisonment claim, a plaintiff must plausibly allege "(1) the illegal restraint of plaintiff by defendant; (2) by force or threat of force; and (3) against the plaintiff's will." Cherry v. United Parcel Serv., Inc., No.

23

5:07-CV-403-D, 2009 WL 8641019, at *12 (E.D.N.C. Sept. 28, 2009) (unpublished) (quotation omitted), aff'd, 402 F. App'x 764 (4th Cir. 2010) (per curiam) (unpublished); Kling v. Harris Teeter Inc., 338 F. Supp. 2d 667, 679 (W.D.N.C. 2002), aff'd, 86 F. App'x. 662 (4th Cir. 2004) (per curiam) (unpublished). "While actual force is not required, there must be an implied threat of force which compels a person to remain where he does not wish to remain or go where he does not wish to go." West v. King's Dep't Store, Inc., 321 N.C. 698, 702, 365 S.E.2d 621, 623–24 (1988). A threat of force suffices when it "induce[s] a reasonable apprehension of force." Id. at 702, 365 S.E.2d at 624 (quotation omitted); see Hales, 260 N.C. at 570, 133 S.E.2d at 227; Hoffman v. Clinic Hosp., Inc., 213 N.C. 669, 669, 197 S.E. 161, 162 (1938) (per curiam).

Benjamin has not plausibly alleged that Gray or Lorentzen used force or threatened force. Thus, Benjamin fails to state a false imprisonment claim against Gray or Lorentzen, and the court dismisses claim fourteen against Gray and Lorentzen.

H.

In claim sixteen, Benjamin alleges retaliation in violation of the North Carolina School Violence Prevention Act ("SVPA"), N.C. Gen. Stat. § 115C-407.15. See Am. Compl. ¶¶ 200–04. Defendants move to dismiss the claim and argue that the SVPA does not provide a private cause of action.

In North Carolina, "[g]enerally, a statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute." Willett v. Chatham Cty. Bd. of Educ., 176 N.C. App. 268, 272–73, 625 S.E.2d 900, 903 (2006) (quotation omitted); see Lea v. Grier, 156 N.C. App. 503, 508, 577 S.E.2d 411, 415 (2003). The North Carolina General Assembly has not provided a private cause of action under the SVPA. Moreover, no North Carolina

24

appellate court has construed the SVPA to establish a private cause of action. Thus, Benjamin's SVPA claim fails to state a claim, and the court dismisses claim sixteen.

IV.

In sum, the court GRANTS the motion to dismiss of defendants Epiphany, Sparks in his official capacity, Lorentzen, Blackerby, and Gray [D.E. 54] and GRANTS the motion to dismiss of defendant Sparks in his individual capacity and the Foundation [D.E. 56]. The court DISMISSES claim one and claim two against Blackerby, Lorentzen, and Gray, claim five, claim twelve, claim thirteen, claim fourteen against Gray and Lorentzen, and claim sixteen. Defendants Blackerby, Lorentzen, and Gray are dismissed as defendants in this action.

SO ORDERED. This **23** day of March 2016.

JAMES C. DEVER III
Chief United States District Judge