IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:14-CV-186-D

| | | |
|---|---|---|
| SAUL HILLEL BENJAMIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| NICHOLAS SPARKS, et al., | ) | |
| | ) | |
| Defendants, | ) | |

On October 2, 2014, Saul Hillel Benjamin ("Benjamin" or "plaintiff") filed this action against

Nicholas Sparks ("Sparks"), The Epiphany School of Global Studies ("Epiphany" or "TESGS"), and

the Nicholas Sparks Foundation ("Foundation") (collectively, "defendants") alleging discrimination

in violation of 42 U.S.C. § 1981, Title VII, and the Americans with Disabilities Act ("ADA");

retaliation in violation of 42 U.S.C. § 1981 and Title VII; breach of contract; defamation; false

imprisonment; and assault [D.E. 1, 51]. On November 13, 2017, defendants moved for summary

judgment. On September 28, 2018, the court granted in part and denied in part Sparks's motion for

summary judgment, the Foundation's motion for summary judgment, and Epiphany's motion for

summary judgment [D.E. 243]. The court enters this order to explain that decision.

I.

In 2005, Nicholas Sparks and Cathy Sparks founded the Epiphany School of Global Studies,

a private, college preparation, coeducational school that celebrates Christian traditions, in New Bern,

North Carolina. See [D.E. 132] ¶¶ 1–2; [D.E. 149] ¶ 2. Epiphany serves students from grades K–12

across two campuses located approximately one quarter mile from each other (the "upper" and

"lower" campuses). See [D.E. 132] ¶ 2. In 2013, Sparks served as chair of Epiphany's Board of Trustees (the "Board"). See [D.E. 149] ¶ 3. Melissa Blackerby, Tracey Lorentzen, and S. McKinley Gray were also members of Epiphany's Board. See [D.E. 51] ¶¶ 17–19. In 2009, Sparks started the Foundation, a non-profit organization that raises scholarship money for Epiphany students and otherwise supports the school. See [D.E. 149] ¶ 5. In 2013, Sparks served as the chair of the Foundation. See id. ¶ 6.

In November 2012, Tom McLaughlin, the school's first "Head of School" or headmaster, announced that he had accepted a position at a school in Texas and would resign at the end of the school year. See id. ¶ 8; [D.E. 143-34] ¶ 10. The Board agreed to start looking for a replacement and formed a Search Committee. See [D.E. 143-34] ¶ 11. The Board retained, through the search firm Carney Sandoe and Associates, a recruiter named Tom Plihcik ("Plihcik") to locate a new headmaster. See [D.E. 149] ¶ 9; [D.E. 132] ¶ 3. Sparks and the Search Committee worked with Plihcik to identify the desired qualifications of Epiphany's next headmaster. See [D.E. 149] ¶ 11; [D.E. 142-18]. Based on advice from Carney Sandoe, Sparks also agreed to divide the headmaster position into two jobs—headmaster and chaplain—both of which McLaughlin had performed. See [D.E. 149] ¶ 12.

In December 2012, Plihcik recommended Benjamin for the position of headmaster. See [D.E. 132] ¶ 4; [D.E. 149] ¶ 13; [D.E. 167] ¶ 76; [D.E. 170] ¶ 272. At the time, Benjamin was a visiting professor at Al Akhawayn University in Morocco. See [D.E. 132] ¶ 5; [D.E. 172-1] 18. Benjamin submitted his CV and, in a follow-up e-mail to Sparks, sent a personal narrative detailing, inter alia, his religious background and his personal educational philosophy. See [D.E. 144-9]; [D.E. 141-1]. Benjamin's CV disclosed that, from 2012 until present, he served as a distinguished professor of liberal arts at Al Akhawayn University in Morocco; from 2009 until 2012, he served as

2

a distinguished professor of liberal arts and international pedagogy at International School of Stuttgart; from 2007 until 2009, he served as a distinguished visiting professor of history and leadership studies at The American Community School at Beirut; from 1999 until 2005, he was the vice president of strategic initiatives and a founding member of Teachscape; from 1996 until 1999, he served as headmaster of The Verde Valley School; from 1993 until 1996, he served as senior advisor and special assistant for policy at the United States Department of Education; from 1991 until 1993, he served as deputy national policy director for Bill Clinton; and from 1985 until 1991, he served as a director of the University Honors Program at Montana State University. See [D.E. 144-9] 2–3. His CV also listed under "Education":

- Dartmouth College's Project ABC (A Better Chance) for poverty/minority students
- *A.B. (1970) Kenyon College*, honors in humanities and interdisciplinary studies
- *M.A. (1980) Oxford University* highest honors in 5 of 8 PPE papers
- *D.Phil. Oxford University*, Theology and Political Philosophy (241 page thesis completed, but degree-authorizing *viva voce* exams postponed due to 1984 car accident)

Id. at 3.

On December 22, 2012, Sparks noted that Benjamin's "résumé [was] . . . staggeringly good" and discussed plans to bring Benjamin to New Bern to meet with the Search Committee. See [D.E. 141-5]. On December 29, 2012, Benjamin and Dr. Jennifer Dueck ("Dueck"), his wife, visited New Bern and met with the members of the Board. See [D.E. 149] ¶ 78; [D.E. 141-6] 2. On January 2, 2013, Sparks e-mailed the Search Committee and indicated his desire to extend an offer to Benjamin quickly. See id. at 5–6; [D.E. 149] ¶ 21; [D.E. 143-34] ¶ 20. In late January 2013, Sparks brought Benjamin back to New Bern "to meet with a broader group of [Epiphany's] community, including students, parents, faculty, and staff." [D.E. 149] ¶ 86. Students, parents, faculty, and staff evaluated

Benjamin on various criteria including "Christian Tradition." See [D.E. 141-8]; cf. [D.E. 145-8] (referring to some parents' concerns about Benjamin's ability to "uphold the Christian pillar" of Epiphany).

On January 28, 2013, the Search Committee voted to extend an offer to Benjamin for the headmaster position. [D.E. 149] ¶ 91. Benjamin accepted and entered into two contracts, one with Epiphany to serve as headmaster and one with the Foundation to serve as an independent contractor. See [D.E. 149] ¶ 97; [D.E. 170] ¶ 292; [D.E. 167] ¶ 96. Benjamin's agreement with Epiphany was for four years with a base salary of $168,000 and benefits. See [D.E. 149] ¶¶ 94–96; [D.E. 141-13]. Benjamin's agreement with the Foundation was also for four years with a salary of $88,000. See [D.E. 149] ¶ 97; [D.E. 141-12]. The Foundation hired Benjamin "so that part of his salary would not be on the books of [Epiphany]." [D.E. 170] ¶ 293. Both contracts provided for a term of employment to begin on July 1, 2013. See [D.E. 141-12, 141-13]. In addition, defendants could terminate Benjamin's employment under both the Epiphany contract[1] and the Foundation contract.[2]

---

[1] Benjamin's employment contract with Epiphany provided, in part:

7. **Termination.** This Agreement shall terminate upon the occurrence of any of the following events: (a) immediately upon the death of the Head of School; (b) upon the effective date of Resignation by the Head of School (as defined below); (c) upon the effective date following notice by the Board to the Head of School of Termination Without Cause (as defined below); (d) upon the close of business on the date the Board gives the Head of School notice of Termination for Cause (as defined below)[;] or (e) upon the close of business on the last day of any extended term upon non-renewal of this Agreement; or (f) upon the end of the time period specified following the Disability of the Head of School (as defined below).

[D.E. 141-13] 5.

[2] Benjamin's independent contractor agreement with the Foundation provided, in part:

Section 6. Cancellation. Foundation may cancel this agreement upon thirty (30) days written notice to Benjamin for any reason. In the event that cancellation occurs

4

Id. The headmaster contract with Epiphany provided that Benjamin be given thirty days to cure any behavior before he could be terminated for cause. See [D.E. 167] ¶¶ 106–07; [D.E. 141-13] 6.

Benjamin's duties at Epiphany began shortly after he was hired. On January 27, 2013, the Board resolved to have David Wang ("Wang"), the assistant headmaster, hire Epiphany's new chaplain. See [D.E. 142-24]; [D.E. 149] ¶ 116. Once Benjamin was hired, the Board agreed that Benjamin and Wang should jointly hire the new chaplain. See [D.E. 142-26]; [D.E. 149] ¶ 118. The Board provided Benjamin with approximately sixty résumés, and Sparks encouraged Benjamin "to act quickly in hiring the chaplain." See [D.E. 149] ¶¶ 119–20. In addition, over the summer, Benjamin revised Epiphany's faculty, student, and community handbooks. See id. ¶¶ 106–11; [D.E. 141-15]. Benjamin revised the grievance policy in the faculty handbook and added a nondiscrimination policy to all handbooks. See [D.E. 149] ¶¶ 107, 111; [D.E. 147-21] ¶ 38.

As the school year began, Benjamin began to have difficulties with faculty, staff, and parents. The parties dispute the extent to which Benjamin contributed to these difficulties. For example, the defendants allege that Benjamin made derogatory remarks about where faculty and staff went to school, criticized faculty and staff who did not share his views, criticized faculty and staff for their religious views, and referred to some Epiphany parents as racists and bigots. See [D.E. 132] ¶¶ 8–11; [D.E. 149] ¶¶ 137–38. The defendants also allege that Benjamin missed critical deadlines,

---

less than nine months prior to the end of Term, or is for any reason other than Benjamin's death, conviction of or entering into a plea bargain or plea of nolo contendere with respect to any felony; any act or acts of fraud or dishonesty by Benjamin; or the persistent refusal of Benjamin to perform services for the Foundation pursuant to this agreement without cause or explanation, the Foundation shall continue Benjamin's compensation for one calendar year following the date of cancellation. Benjamin's compensation shall also continue for one year following expiration of this Agreement or any extension thereof.

[D.E. 141-12] 3.

failed to integrate himself into the Epiphany community (e.g., because Benjamin did not regularly attend school events), and did not spend enough time at Epiphany's lower campus. See [D.E. 132] ¶¶ 11–14; [D.E. 149] ¶¶ 135–36. Benjamin disputes these allegations.

For his part, Benjamin alleges that some members of the Epiphany community were skeptical of him from the outset because of his religion and, inter alia, his views on diversity. See, e.g., [D.E. 170] ¶¶ 273–77, 286–88, 290–91, 306–10, 314–15, 319–23, 329–30, 343. Benjamin alleges that he was committed to increasing racial diversity amongst Epiphany's faculty, staff, and student body. See [D.E. 170] ¶ 350; [D.E. 51] ¶ 33.[3] As part of his diversity initiative, Benjamin organized a trip to Washington, D.C., for the fiftieth anniversary of the 1963 Civil Rights March and Martin Luther King, Jr.'s "I Have a Dream" speech. See [D.E. 170] ¶ 356. Benjamin also began to change Epiphany chapel procedures, which did not go over well with some Epiphany community members. See [D.E. 170] ¶¶ 309, 381.

At some point during the fall of 2013, some in the Epiphany community began having issues concerning student sexual orientation. See, e.g., [D.E. 172-9] 3. For example, Benjamin alleges that a teacher at Epiphany made disparaging remarks about LGBT individuals to his students. See [D.E. 170] ¶¶ 326–28. The parties dispute whether students, of their own volition, approached a faculty member to informally discuss issues concerning their sexual identities or whether Benjamin was involved in founding or facilitating a secret LGBT club. Compare [D.E. 132] ¶ 16, and [D.E. 149] ¶¶ 125, 133–34, with Resp. [D.E. 167] ¶ 16, and [D.E. 170] ¶ 332, and [D.E. 172-9] 3–4. Benjamin denies any involvement in starting an LGBT club and denies the club's existence. See, e.g., [D.E. 145-20] 4. But see, e.g., [D.E. 143-3] 13.

---

[3] Sparks disputes any implication that Benjamin alone was committed to diversity initiatives at Epiphany. See Resp. [D.E. 194] ¶¶ 357–58, 364.

6

Benjamin alleges that some Epiphany students bullied other students based on their sexual orientation. For example, Wang received a report that a student called for a "homocaust" while in class. See [D.E. 149] ¶ 152; [D.E. 170] ¶ 329; [D.E. 172-9] 4. Benjamin and Wang met with the students accused of bullying and their parents. See [D.E. 149] ¶¶ 153–55; [D.E. 172-9] 4. The parents reported that Benjamin's conduct during the meeting was hostile and combative. See [D.E. 149] ¶¶ 155–56; [D.E. 141-26, 141-27, 141-30, 141-31]. Around this time, Benjamin addressed sexual orientation during chapel. See [D.E. 170] ¶ 330. Sparks noted in an e-mail to the Board that he perceived that some members of the Epiphany community found Benjamin's behavior "too provocative" and that Benjamin had "misplaced priorities at the school level (GLBT, diversity, the beauty of other religions, as opposed to academic/curricular/global issues, Christian traditions, etc.)." [D.E. 172-20]. Sparks also noted that, while some community members were justifiably upset, many others were pleased with the state of Epiphany, including Sparks's own children. Id.

In October 2013, the Board began to express frustration with Benjamin because Benjamin had not yet hired a chaplain and because of his conflicts with Epiphany faculty, staff, and parents. See [D.E. 132] ¶ 24; [D.E. 149] ¶¶ 143–45; [D.E. 141-22, 172-33, 172-34, 172-36]. On October 30, 2013, the Board met with Benjamin during its monthly meeting. See [D.E. 149] ¶ 142. Benjamin circulated a twenty-two page report to the Board in advance of the meeting detailing his work at Epiphany to that point. See [D.E. 141-18].[4] The Board also had a conversation about Benjamin's challenges and successes at Epiphany, which they hoped would improve things at the school. See [D.E. 149] ¶¶ 147, 149; [D.E. 146-20].

---

[4] As part of the report, Benjamin stated that "no week has gone by without [his] spending at least one full and sometimes two full days at [the lower campus]." [D.E. 141-18]. Benjamin conceded, however, that he "need[ed] to find ways to better schedule" his upper and lower campus schedules because the upper campus demanded more of his time. Id.

7

Despite the Board's hope, Benjamin's relationship with the Epiphany community did not improve. For example, the manner in which Benjamin handled the alleged bullying upset some Epiphany parents. Conversely, Benjamin alleges that his relationship with the community did not improve because Epiphany community members, including Board members, displayed contempt for his religious preferences. Cf. [D.E. 144-33] 6. For example, Benjamin alleges that Gray and Lorentzen confronted him about referring to Jesus as a rabbi and that Sparks discouraged him from using the phrase "The Peoples of the Book" to "equate[] Christians, Jews and Muslims." See [D.E. 170] ¶¶ 305, 307. Sparks also said in an e-mail to the Board: "While I have issues with Saul (as you know) in the 'faith area', the [headmaster] report—and what it says—is not among them, since it's mainly about administrative and college-prep focused issues." [D.E. 173-8]. The Board also repeatedly reiterated that Benjamin needed to hire a Christian to serve as chaplain. See [D.E. 172-34] ("[I]t should be made perfectly clear that the potential Chaplain should self-identify himself/herself as Christian, either mainline Protestant . . . or Catholic."); [D.E. 170] ¶¶ 312–13. Benjamin also alleges that, on November 9, 2013, Benjamin hosted a dinner during which an Epiphany community member asked "How can we trust a Jew to hire a Christian Chaplain?" See [D.E. 170] ¶ 311.

Benjamin alleges that Epiphany's Board and community resisted his efforts at increasing racial diversity. Benjamin contends that Sparks suggested that African-American students could not succeed at Epiphany, and Gray suggested that Epiphany's lack of athletic programs prevented the school from effectively recruiting non-white students. See [D.E. 170] ¶¶ 346–49. Benjamin also alleges that he was criticized for openly recruiting African-American students and affiliating with New Bern's African-American community, including by attending an NAACP meeting. See [D.E. 170] ¶¶ 351–55. Defendants dispute these allegations. Furthermore, Benjamin alleges that he

8

changed the school's nondiscrimination policy because the school would lose its accreditation otherwise, but Sparks says that Benjamin never sought legal advice concerning the policy and that the school's policy complied with all requirements. See [D.E. 144-5] 28.

On November 17, 2013, Sparks wrote an e-mail to Benjamin describing the situation at the school as a "crisis." [D.E. 170] ¶ 162; [D.E. 146-21]. Sparks highlighted Benjamin's advocacy on issues such as diversity and sexual orientation, his handling of alleged bullying, his treatment of religion particularly during chapel, and his treatment of Epiphany faculty and staff as contributing to the school's crisis. See [D.E. 146-21]. Nevertheless, in advance of the Board's annual Board Forum, Sparks e-mailed the Board and urged its members to support Benjamin. See [D.E. 149] ¶ 167.

On November 19, 2013, the Board held its annual Forum. See [D.E. 132] ¶ 30; [D.E. 149] ¶ 174. During the Forum, Benjamin spoke about his personal religious beliefs. See [D.E. 132] ¶ 31; Resp. [D.E. 167] ¶ 31. The parties dispute whether Benjamin gave the speech voluntarily or whether Sparks required that Benjamin give the speech to explain his beliefs to the Epiphany community. Compare [D.E. 132] ¶ 33, with [D.E. 167] ¶¶ 195–201; see [D.E. 172-19]. Benjamin maintains, however, that explaining his personal religious beliefs in such a manner conflicted with his Quaker religion. See [D.E. 51] ¶ 63. Benjamin alleges that, following his speech, some audience members berated him, and Board members applauded such behavior. See [D.E. 167] ¶¶ 210–13. After Benjamin's speech, Gray explained how to file formal grievances, and Benjamin alleges that Sparks closed the Forum by soliciting grievances from Epiphany parents. See [D.E. 132] ¶ 34; [D.E. 167] ¶¶ 202–05, 214–15.

The alleged solicitation of grievances is relevant because, around this time, Sparks and the Board began the process of removing Benjamin from his position as Epiphany headmaster. On

9

November 18, 2013, Sparks sent an e-mail to the Board that detailed the formal grievance process and noted that he did not want to pay Benjamin's remaining salary under his contract in the event of a legal battle. See [D.E. 167] ¶ 184. On the same day, Sparks sent another e-mail saying that, if Benjamin is "fired without cause, it will cost the school $664,000, plus the remainder of this year's salary." See id. ¶ 186 (alteration omitted). Sparks included in that e-mail a copy of the school's policy on termination for cause. Id. On November 19, 2013, Sparks e-mailed the Board that he "need[ed] faculty evidence of terminable offenses [for Benjamin]." Id. ¶ 188; [D.E. 173-5]. Later, Sparks told Gray that "we're going to try to get Benjamin to resign voluntarily." See [D.E. 167] ¶ 232 (alteration omitted). Faculty and parents submitted at least nine formal grievances and additional informal grievances. See [D.E. 167] ¶ 217; [D.E. 145-32–145-39]; [D.E. 141-27, 141-29, 141-30].

On November 21, 2013, Sparks sent Benjamin an e-mail: "As Chairman of the [Board], I am requesting to meet with you in your office at 1:00pm today, Thursday, Nov. 21." [D.E. 172-18]. Sparks called Gray and Lorentzen and asked them to join him for the meeting with Benjamin. See [D.E. 149] ¶ 200. Benjamin arrived for the meeting, rescheduled for the school's conference room, and saw that Sparks, Gray, and Lorentzen were already present. See [D.E. 149] ¶¶ 202–03; [D.E. 170] ¶ 429. Epiphany's conference room is located at the end of a side hallway next to the headmaster's office. See [D.E. 149] ¶ 202. The room has one small window facing the entrance hall of the school. Id.

The parties dispute what happened during the meeting. According to Benjamin, once Benjamin entered the room, Sparks immediately began shouting at Benjamin and held his fist in front of Benjamin's face. See [D.E. 170] ¶¶ 431, 433–34, 437–39; cf. [D.E. 149] ¶ 211. Benjamin says that he felt physically threatened and was prevented from contacting anyone, including a lawyer.

See [D.E. 170] ¶¶ 439–42. Benjamin alleges that he was told that he was being fired from Epiphany and the Foundation. See [D.E. 170] ¶¶ 431–32. In addition, Benjamin alleges that Gray told Benjamin that, if he left the room, he would be terminated for cause. See id. ¶ 435; [D.E. 149] ¶ 217.

Sparks, on the other hand, maintains that the meeting was held to negotiate a resignation so that Benjamin would not have to be terminated for cause. See [D.E. 149] ¶ 201. Sparks alleges that the Board had cause to terminate Benjamin. See id. ¶ 207. In particular, Sparks said that Benjamin lied to the Board in his headmaster report concerning Benjamin's time spent at the lower campus. See id. ¶ 208. While Benjamin said he spent one to two days per week at the lower campus, Sparks alleges that Benjamin spent little to no time there at all. See id. ¶ 208; [D.E. 145-34] 3. Sparks alleges that Benjamin asked if he was going to be fired over such a technicality, calling his statement in the report a "modest understatement." See [D.E. 149] ¶¶ 209–10.

After approximately 45 minutes, Lorentzen suggested that they call Dueck to join the meeting. See [D.E. 149] ¶ 230. Sparks left the room when Dueck arrived but later returned. See id. ¶ 232. Benjamin alleges that Gray told Benjamin that he was fired and that he needed to sign something that said he was resigning. See [D.E. 170] ¶ 450; [D.E. 167] ¶ 254. Benjamin also alleges that Sparks or Gray dictated the terms of Benjamin's resignation, which Benjamin hand wrote. See [D.E. 167] ¶ 255; Resp. [D.E. 170] ¶ 239; [D.E. 170] ¶ 451; see also [D.E. 142-9]. The note, which Benjamin claims Sparks forced him to write, is partially illegible. See [D.E. 170] ¶¶ 452–53; [D.E. 142-9]. The parties dispute whether Benjamin voluntarily resigned and whether the parties agreed to refer to Benjamin's resignation/termination as an issue of "fit." See [D.E. 149] ¶ 244. In total, the meeting lasted between ninety minutes and two hours. See id. ¶ 218.

Following the meeting, Dueck and Sparks discussed Benjamin's mental health. See, e.g., [D.E. 149] ¶ 240. The parties dispute whether Dueck or Sparks initiated the conversation. That

11

night, Benjamin e-mailed Plihcik and stated that he resigned from Epiphany. Benjamin forwarded the e-mail to Sparks, Lorentzen, and Gray. See [D.E. 149] ¶¶ 242–43. Sparks later e-mailed Dueck and further discussed Benjamin's mental health:

> I honestly believe he's incapable of working another job, but that's my opinion. He may be able to consult for a while, but again, I'm just guessing. The fact is this: [Benjamin] is NOT the man we hired in January. And he's gotten worse since late August, when school started up. And yet, again, I suspect it's not his fault. Which is why I'm not angry with him. And yet, I also hope you understand why we had to ask for his resignation.

[D.E. 142-17].

On November 22, 2013, Emily Sweet sent an e-mail to Benjamin notifying him that his contract with the Foundation had been terminated. See [D.E. 143-28]. Sweet said that her message confirmed Benjamin's conversation with Sparks that "[t]he Foundation is cancelling the [independent contractor agreement]." Id. Sweet noted that the reason for Benjamin's termination was for cause for "any act of fraud or frauds or dishonesty by Benjamin." Id. On November 25, 2013, the Foundation sent Benjamin an updated letter that referenced his resignation, not termination. See [D.E. 149] ¶ 250.

In the time leading up to and shortly after Benjamin's departure, Sparks made comments to others concerning Benjamin's mental health. Sparks called Plihcik and said that "he thought [Benjamin] was insane," that "he . . .wasn't the guy that [Sparks] hired," and "that he may have had a stroke or something." [D.E. 149] ¶ 197. Sparks told the Board that Benjamin "may be suffering from dementia or Alzheimer's or something along those lines because [Benjamin] just did not appear rational in his actions." [D.E. 149] ¶ 256 (alteration omitted). Finally, Sparks told Epiphany parent Renee Coles that Sparks "had to terminate Mr. Benjamin because Mr. Benjamin had dementia and bipolar disease" and "that bipolar disease runs in Mr. Benjamin's family." [D.E. 143-32]; see [D.E.

12

149] ¶ 255; [D.E. 143-33] ¶ 29; [D.E. 143-34] ¶ 96.

On October 2, 2014, Benjamin filed suit in federal court. See Compl. [D.E. 1] 1. Benjamin's amended complaint contains sixteen claims. See Am. Compl. [D.E. 51] ¶¶ 119–204. During discovery, defendants discovered numerous factual inconsistencies in Benjamin's CV. For example, Benjamin excluded his position as President of Deep Springs College from prior work experience. See [D.E. 132] ¶¶ 67–70, 74. Benjamin resigned from Deep Springs after being employed for less than one year, and Benjamin maintains that he has been told by multiple recruiters to not include it on his CV. In addition, defendants allege that Benjamin's CV implies that Benjamin earned a D.Phil. degree from Oxford, a degree that Benjamin does not hold. See [D.E. 132] ¶ 70. Finally, defendants allege that Benjamin's CV misstates his dates of employment at Montana State University, in part to cover up his resignation from Deep Springs. See [D.E. 132] ¶ 74.

On March 23, 2016, this court dismissed certain claims and certain defendants. See Benjamin v. Sparks, 173 F. Supp. 3d 272 (E.D.N.C. 2016); [D.E. 54–57]. On November 13, 2017, the remaining defendants—Sparks, the Foundation, and Epiphany—moved for summary judgment on all remaining claims. See [D.E. 131, 139, 140]. Benjamin opposed the motions for summary judgment [D.E. 168, 169, 176].

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the

13

nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252.; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

A.

In count one, Benjamin alleges that Sparks, the Foundation, and Epiphany discriminated against him based on his Jewish race in violation of 42 U.S.C. § 1981. See Am. Compl. ¶¶ 119–23; 42 U.S.C. § 1981. Section 1981 provides a cause of action against private parties who deprive others of the power to make and enforce contracts on the basis of race. See 42 U.S.C. § 1981; Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459–60 (1975). Purposeful, racially discriminatory actions that impair an employment contract violate section 1981. See, e.g., Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 & n.7 (4th Cir. 2002); Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018–19 (4th Cir.1999); Pearsall v. Child Advocacy Comm'n of Lower Cape Fear, Inc., No. 7:98-CV-200-BR,

14

2000 WL 33682693, at *5–7 (E.D.N.C. Feb. 15, 2000) (unpublished). Individuals of Jewish descent "are considered to be a separate race" under section 1981. See Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 617 (1987); Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609–13 (1987).

A plaintiff may establish a section 1981 claim in two ways. See Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 910 (4th Cir. 1989); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 & n.4 (4th Cir. 2005); Cherry v. Elizabeth City State Univ., 147 F. Supp. 3d 414, 421 (E.D.N.C. 2015). First, a plaintiff may demonstrate through direct evidence that illegal discrimination motivated an employer's adverse employment action. Alternatively, a plaintiff may proceed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See generally Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc).

To show discrimination by direct evidence, a plaintiff typically must show discriminatory motivation on the part of the decisionmaker involved in the adverse employment action. See Hill, 354 F.3d at 286–91. Such direct evidence would include a decisionmaker's statement that he terminated the plaintiff's contract due to his race. The decisionmaker must be either the employer's formal decisionmaker or a subordinate who was "principally responsible for," or "the actual decisionmaker behind," the allegedly discriminatory action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151–52 (2000).

Even without direct evidence of discrimination, a plaintiff's section 1981 claim can survive summary judgment if the plaintiff raises a genuine issue of material fact under the burden-shifting framework established in McDonnell Douglas. Under McDonnell Douglas, a plaintiff may prove a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of his

15

discharge; and (4) the discharge arose under circumstances permitting a reasonable inference of race discrimination. See, e.g., Hill, 354 F.3d at 285; White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Ricketts v. Logics, LLC, No. 5:15-CV-293-D, 2017 WL 4293406, at *3 (E.D.N.C. Sept. 27, 2017) (unpublished).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the [defendant's] stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves, 530 U.S. at 143; King v. Rumsfield, 328 F.3d 145, 150–54 (4th Cir. 2003).

A plaintiff can prove pretext by showing that the alleged nondiscriminatory "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [race] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147. In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 215–17 (4th Cir. 2007); Hawkins v. PepsiCo., Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. Under Reeves and its Fourth Circuit progeny, a plaintiff asserting a section 1981 claim may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [race]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases,

however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

An employer is entitled to summary judgment on the issue of pretext if the employee "create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that" the alleged illegal discrimination did not occur. Reeves, 530 U.S. at 148. Moreover, a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate, nondiscriminatory reasons for a discharge. See Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999); Iskander v. Dep't of the Navy, 116 F. Supp. 3d 669, 678–79 (E.D.N.C. 2015), aff'd, 625 F. App'x. 211 (4th Cir. 2015) (per curiam) (unpublished). An employer lawfully can rely on poor performance in taking adverse employment action. See Mereish, 359 F.3d at 335; Hawkins, 203 F.3d at 280; Fisher v. Asheville-Buncombe Tech. Cmty. Coll., 857 F. Supp. 465, 469–70 (W.D.N.C. 1993), aff'd, 25 F.3d 1039 (4th Cir. 1994) (per curiam) (unpublished table decision).

"While individual liability cannot attach to individual members of the Board of Directors under Title VII, the Directors may be liable for violations of § 1981 if they have intentionally discriminated against plaintiff." Pearsall, 2000 WL 33682693, at *6. "Personal liability under section 1981 must be predicated on the actor's personal involvement." Patterson v. Cty. of Oneida, 375 F.3d 206, 229 (2d Cir. 2004) (quotation and alteration omitted); see Hawthorne v. Va. State Univ., 568 F. App'x 203, 204–05 (4th Cir. 2014) (per curiam) (unpublished). "[A] plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action . . . ." Hawthorne, 568 F. App'x at 204–05 (quotation omitted). For example, individual supervisors may be held liable under section 1981 if they intentionally cause an employer to discriminate based on race. See, e.g., Alexander v. City of Greensboro, 762 F. Supp. 2d 764, 790–92 (M.D.N.C. 2011);

17

Carson v. Giant Food, Inc., 187 F. Supp. 2d 462, 483 (D. Md. 2002) ("Directors or managers can be held personally liable when they intentionally cause a Corporation to infringe the rights secured by section 1981," but cannot be held liable when there is no evidence that they "directed, participated in or even approved of intentional discrimination." (quotations omitted)), aff'd sub nom., Skipper v. Giant Food Inc., 68 F. App'x 393 (4th Cir. 2003) (per curiam) (unpublished). Section 1981, however, imposes liability on an individual only for his or her own intentional actions that cause an infringement of section 1981. See, e.g., Tibbs v. Balt. City Police Dep't, No. RDB–11–1335, 2012 WL 3655564, at *6 (D. Md. Aug. 23, 2012) (unpublished); Luy v. Balt. Police Dep't, 326 F. Supp. 2d 682, 688 (D. Md. 2004), aff'd, 120 F. App'x 465 (4th Cir. 2005) (per curiam) (unpublished); Pearsall, 2000 WL 33682693, at *6 (collecting cases).

Benjamin has not produced direct evidence that defendants terminated his contracts due to his Jewish race. See [D.E. 168] 14. Thus, Benjamin proceeds under the burden-shifting framework.

As for Benjamin's section 1981 claim against Sparks, the court assumes without deciding that Benjamin has established the first three elements of his prima facie case. See Spring v. Bd. of Trs. of Cape Fear Cmty. Coll., No. 7:15-CV-84-BO, 2017 WL 432789, at *2–3 (E.D.N.C. Jan. 30, 2017) (unpublished) (forced resignation can constitute adverse employment action); Reynolds v. Town of Suffield, No. 3:10cv1528 (JBA), 2012 WL 3135896, at *5 (D. Conn. July 31, 2012) (unpublished) (same). Even viewing the evidence in the light most favorable to Benjamin, no rational jury could find that Sparks discriminated against Benjamin due to his Jewish race. During the hiring process, Sparks knew about Benjamin's Jewish race and advocated hiring him. See [D.E. 149] ¶¶ 21, 81; [D.E. 141-6] ¶¶ 4–6 ("Should we offer [Benjamin] the position? YES. [Benjamin] is without question the most qualified candidate for where we are right now as a school . . . . He's the most qualified, period, and there's no doubt in my mind that he's the finest candidate we would

18

interview, no matter how long we draw out this process."). Moreover, Sparks supported Benjamin even after Benjamin began having performance problems at Epiphany. See [D.E. 149] ¶¶ 143, 145. Furthermore, Sparks did not make any comments reflecting racially discriminatory animus concerning Benjamin's Jewish race before, during, or after the November 21 meeting.

The same-actor inference supports the conclusion that race discrimination did not motivate Sparks. Epiphany and the Foundation, with Sparks's full support, hired Benjamin less than one year before Benjamin's alleged termination, and Sparks knew of Benjamin's Jewish race from the beginning. Even viewing the record in the light most favorable to Benjamin, no rational jury could conclude that the same person who was instrumental in having Epiphany and the Foundation hire Benjamin knowing about his Jewish race possessed racial animus due to Benjamin's Jewish heritage less than one year later. See Proud v. Stone, 945 F.2d 796, 797–98 (4th Cir. 1991) (discussing the same-actor inference); see also Taylor v. Va. Union Univ., 193 F.3d 219, 231 (4th Cir. 1999) (en banc), abrogated in part on other grounds by Desert Palace Inc., v. Costa, 539 U.S. 90 (2003); Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 214–15 (4th Cir. 1994); Ricketts, 2017 WL 4293406, at *5; Abulsaad v. Reliable & Loyal Mgmt., No. 7:11-CV-241-FL, 2013 WL 5177665, at *12 (E.D.N.C. Sept. 12, 2013) (unpublished). Thus, Benjamin's section 1981 claim against Sparks fails.

Alternatively, even if the court assumes that Benjamin established a prima facie case of race discrimination, Sparks had a legitimate, nondiscriminatory reason for having Epiphany and the Foundation discharge Benjamin: poor performance. The poor performance included Benjamin's dishonesty concerning time spent at the lower campus, Benjamin's lack of engagement with the Epiphany community, and Benjamin's failure to hire a chaplain. See [D.E. 193] 4. As for pretext, taking the evidence in the light most favorable to Benjamin, Benjamin can show that Sparks allegedly told at least one Epiphany parent that he terminated Benjamin due to Benjamin's alleged

19

mental illness, not poor performance. See [D.E. 149] ¶ 255; [D.E. 170] ¶¶ 478, 480. This evidence creates a genuine issue concerning whether the articulated reason for Benjamin's termination was false. Nonetheless, even viewing the record in the light most favorable to Benjamin, no rational jury could find that Sparks discriminated against Benjamin on the basis of his Jewish race (particularly given the same-actor inference). See Reeves, 530 U.S. at 148–49; Holland, 487 F.3d at 216–18; Laber, 438 F.3d at 430–31. Accordingly, the court grants Sparks's motion for summary judgment on count one.

As for Benjamin's section 1981 race discrimination claim against the Foundation, the claim also fails. In asserting a section 1981 race discrimination claim against the Foundation, Benjamin primarily relies on Sparks's alleged conduct. See [D.E. 169] 19–22. Benjamin has failed to raise a genuine issue of material fact concerning Sparks under section 1981, and he also has failed to failed to raise a genuine issue of material fact concerning the Foundation under section 1981. Accordingly, the court grants the Foundation's motion for summary judgment on Benjamin's section 1981 race discrimination claim.

As for Benjamin's section 1981 race discrimination claim against Epiphany, Benjamin's claim similarly fails. Even if Benjamin can show a prima facie case of race discrimination against Epiphany, Epiphany has a legitimate, nondiscriminatory reason for terminating Benjamin: poor performance. As with Sparks, Benjamin has not created a genuine issue of material fact concerning whether Epiphany's articulated reason for Benjamin's termination, even if false, was a pretext for race discrimination. See Reeves, 530 U.S. at 148–49; Holland, 487 F.3d at 216–18; Laber, 438 F.3d at 430–31. No rational jury (particularly in light of the same-actor inference) could find that Epiphany discriminated against Benjamin on the basis of his Jewish race. Accordingly, the court grants Epiphany's motion for summary judgment on count one.

20

B.

In count one, Benjamin alleges that Sparks, the Foundation, and Epiphany harassed him based on his Jewish race in violation of section 1981. See Am. Compl. ¶¶ 119–23. To state a hostile work environment claim under section 1981, Benjamin must plausibly allege that (1) he experienced unwelcome harassment, (2) the harassment was based on his Jewish race, (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (4) the harassment was imputable to his employer. See Causey v. Balog, 162 F.3d 795, 801, 804 (4th Cir. 1998); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc) (listing similar elements for prima facie case for hostile work environment under Title VII). A "plaintiff [also] must demonstrate some affirmative link to causally connect the actor with the discriminatory action, and the claim must be predicated on the actor's personal involvement." Hawthorne, 568 F. App'x at 204–05 (quotations omitted). To be attributable to the defendant, conduct must either have been the action of a particular defendant or have been authorized or directed by him. See, e.g., Atkins v. Winchester Homes, No. CCB-06-278, 2007 WL 269083, at *9 (D. Md. Jan. 17, 2007) (unpublished) ("Under Section 1981, individual supervisors must play an active role in the harassment to trigger liability."); Carson, 187 F. Supp. 2d at 483–84.

To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and to create an abusive working environment, the court examines the allegations both subjectively and objectively. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). First, the employee must subjectively consider the conduct to be sufficiently severe or pervasive as to alter his conditions of employment. See, e.g., Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015)

21

(en banc). Second, a court views the conduct from the perspective of a reasonable person in the employee's position to determine whether it is objectively severe or pervasive. See, e.g., Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 787–88; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998); Boyer-Liberto, 786 F.3d at 277.

The objective component helps courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). The court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The conduct must be severe or pervasive to be actionable. See id.; Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277–78. Section 1981 does not create a general civility code for the American workplace. See Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277. The "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277–81. Simple teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68–69 (2006); Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788; cf. Boyer-Liberto, 786 F.3d at 277–81. Likewise, mere rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Baqir v. Principi, 434 F.3d 733, 746–47 (4th Cir. 2006); see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; cf. Boyer- Liberto, 786 F.3d at 277–81; Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207–10 (4th Cir. 2014); Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli v. City of Balt., 648 F.3d 216, 220–22 (4th Cir. 2011).

22

Although hostile work environment claims often involve repeated conduct, an "isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." Boyer-Liberto, 786 F.3d at 277 (quotations and alterations omitted); see Pryor v. United Air Lines, Inc., 791 F.3d 488, 496–97 (4th Cir. 2015); Okoli, 648 F.3d at 220 & n.5. Furthermore, in assessing the severity of the harassing conduct, the status of the harasser is an important factor. See Boyer-Liberto, 786 F.3d at 278; Sonnier v. Diamond Healthcare Corp., 114 F. Supp. 3d 349, 356 (E.D. Va. 2015). A "supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998); see Boyer-Liberto, 786 F.3d at 278.

Even viewing the record in the light most favorable to Benjamin, no rational jury could find that defendants harassed Benjamin because he was Jewish or that the conduct attributable to any of the defendants was objectively severe or pervasive enough to constitute a change in the terms of Benjamin's employment. See Baqir, 434 F.3d at 746–47; Ismail v. United Transp. Union, No. 7:13-CV-94-BR, 2015 WL 1893577, at *6 (E.D.N.C. Apr. 27, 2015) (unpublished). Therefore, the court grants defendants' motions for summary judgment on Benjamin's section 1981 harassment claim.

## C.

In count two, Benjamin alleges retaliation in violation of section 1981. See Am. Compl. ¶¶ 124–28. Section 1981 provides a remedy not only for a person who claims race discrimination concerning a contract but also for a person claiming retaliation in response to complaining about a section 1981 violation. See, e.g., CBOCS W., Inc. v. Humphries, 553 U.S. 442, 451–52 (2008); Boyer-Liberto, 786 F.3d at 281. Benjamin's amended complaint contains no direct evidence of retaliation under section 1981, and Benjamin proceeds under the McDonnell Douglas burden-shifting

framework. See, e.g., Boyer-Liberto, 786 F.3d at 281; Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004); Bryant, 333 F.3d at 543–45.

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) the party to his contract took an action against him that a reasonable person would find materially adverse; and (3) a causal connection existed between the protected activity and the adverse action. See, e.g., Burlington N. & Santa Fe Ry., 548 U.S. at 67–70; DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015); Boyer-Liberto, 786 F.3d at 271; Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); Holland, 487 F.3d at 218; Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001).

As for the first element, protected activity under section 1981 includes using "informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's [racially] discriminatory activities." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998); see Chang Lim v. Azar, 310 F. Supp. 3d 588, 603–04 (D. Md. 2018). Furthermore, the plaintiff must show that the employment practices he opposed were either "actually unlawful" under section 1981 or that he reasonably believed the employment practices were unlawful under section 1981. See Breeden, 532 U.S. at 271; DeMasters, 796 F.3d at 417; Boyer-Liberto, 786 F.3d at 282; Bonds v. Leavitt, 629 F.3d 369, 384 (4th Cir. 2011); Chang Lim, 310 F. Supp. 3d at 603–04. "Complaints about management activities that would not constitute unlawful discrimination [under section 1981] do not count as protected activity." Chang Lim, 310 F. Supp. 3d at 604; see Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216–17 (4th Cir. 2002); Brown v. Goodwill Indus. of E. N.C., Inc., No. 4:17-CV-144-D, 2018 WL

24

2422315, at *2–3 (E.D.N.C. May 29, 2018) (unpublished).

As for Benjamin's retaliation claims under section 1981, Benjamin has not produced sufficient evidence to establish a prima facie case. First, Benjamin did not engage in protected activity under section 1981. See [D.E. 176] 25–26. Rather, Benjamin notes that, as one of his first initiatives as headmaster, he advocated to increase student diversity at Epiphany. Id. at 6. Benjamin's alleged advocacy for increased diversity at Epiphany, whether in its faculty, staff, or students, does not constitute protected activity under section 1981. See Holden v. Owens-Illinois, Inc., 793 F.2d 745, 749 (6th Cir. 1986); Quintana v. Fujifilm N. Am. Corp., 96 F. Supp. 3d 601, 620 (N.D. Tex. 2015); Montgomery v. DePaul Univ., No. 10 C 78, 2012 WL 3903784, at *9–10 (N.D. Ill. Sept. 7, 2012) (unpublished); Hood v. Pfizer, Inc., No. 04-3836(SRC), 2007 WL 2892687, at *19 (D.N.J. Sept. 28, 2007) (unpublished). Likewise, voicing concern about possible disparate treatment of students based on sexual orientation is not protected activity under section 1981. See Stennis v. Bowie State Univ., 716 F. App'x 164, 167 (4th Cir. 2017) (per curiam) (unpublished); see also Harmon v. Cumberland Cty. Bd. of Educ., 186 F. Supp. 3d 500, 506 (E.D.N.C. 2016). Moreover, Benjamin could not reasonably believe that Epiphany's hiring or student admission practices were unlawfully racially discriminatory. See [D.E. 144-5] 28. Thus, to the extent that Benjamin claims that he was opposing unlawful activity, he did not engage in protected activity under section 1981. See Breeden, 532 U.S. at 271; Boyer-Liberto, 786 F.3d at 282.

Even if Benjamin engaged in protected activity under section 1981, Benjamin has not produced sufficient evidence of causation. Benjamin claims that he began advocating for increased diversity at Epiphany as one of his first initiatives in August 2013. See [D.E. 176] 6; [D.E. 172-12] ¶ 11. Benjamin, however, did not suffer any adverse employment consequences until November 21, 2013, a gap of over three months. A three-month lapse between Benjamin's alleged protected

activity and his alleged termination is insufficient to establish causation for a retaliation claim. See,

e.g., Breeden, 532 U.S. at 273–74; Perry v. Kappos, 489 F. App'x 637, 643 (4th Cir. 2012)

(unpublished) (noting that "a three-month lapse is too long to establish causation"); Dowe v. Total

Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) (a "lengthy time

lapse" between protected activity and adverse employment action negates any inference of

causation); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (three-month time lapse

insufficient); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (same); Jones v. Dole

Food Co., 827 F. Supp. 2d 532, 554 (W.D.N.C. 2011) ("[C]omplaints of retaliation are considered

stale after only a few months."); cf. King, 328 F.3d at 151 n.5 (a two-month time lapse between

protected activity and adverse employment action "is sufficiently long so as to weaken significantly

the inference of causation between the two events").

    Alternatively, even if Benjamin established a prima facie case of section 1981 retaliation, no

rational jury could find that Sparks, the Foundation, and Epiphany retaliated against Benjamin for

protected activity under section 1981. As discussed, defendants had a legitimate, non-retaliatory

reason for terminating Benjamin's employment (i.e., poor performance). As for pretext, assuming

that advocating for increased diversity at Epiphany was a protected activity and viewing the evidence

in the light most favorable to Benjamin, Benjamin can show that Sparks was frustrated with

Benjamin's advocacy for diversity at the expense of other job requirements like hiring a chaplain.

See, e.g., [D.E. 173-17]. Moreover, viewing the evidence in the light most favorable to Benjamin,

some Board members questioned Benjamin's diversity initiatives. See, e.g., [D.E. 170] ¶ 170.

Nevertheless, no rational jury could conclude that Benjamin's advocacy for diversity caused

defendants to terminate Benjamin's contract with Epiphany or his contract with the Foundation. See

Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 346–360 (2013); Holland, 487 F.3d at 216–18;

Price, 380 F.3d at 215–17; Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444 (4th Cir. 1998); Miles-Stephens v. N.C. Dep't of Corr., No. 5:11-CV-597-D, 2014 WL 3110018, at *6 (E.D.N.C. July 7, 2014) (unpublished). Accordingly, the court grants defendants' motions for summary judgment on Benjamin's section 1981 retaliation claim.

## D.

In count three, Benjamin alleges that Epiphany terminated him because of his religion in violation of Title VII. See Am. Compl. ¶¶ 129–33. Title VII prohibits an employer from terminating an employee "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Benjamin alleges that Epiphany terminated his employment because of his Jewish and Quaker religions. See [D.E. 176] 21–23. In support, Benjamin notes Board member statements that Epiphany was a Christian school, Board member statements that some Epiphany community members would not trust Benjamin because of his religious background, Board member requests that Benjamin not refer to religions besides Christianity, Epiphany community member requests that Benjamin declare that he believe in God, and Board member criticism of Benjamin's support for LGBT students. See id. at 22. Because Benjamin has not produced direct evidence of discrimination on the basis of his religion, Benjamin proceeds under the burden-shifting framework.

The court assumes without deciding that Benjamin can show a prima facie case of religious discrimination. See Abeles v. Metro. Wash. Airports Auth., 676 F. App'x 170, 174–75 (4th Cir. 2017) (unpublished); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Broadway v. United Parcel Serv., Inc., No. 5:16-CV-803-D, 2018 WL 542666, at *3 (E.D.N.C. Jan. 24, 2018) (unpublished). As discussed, Epiphany has offered a legitimate, nondiscriminatory reason for Benjamin's alleged termination: poor performance. Thus, the burden shifts to Benjamin to show evidence of pretext. As for pretext, Benjamin mischaracterizes some of

27

the statements by Board members that he claims show pretext for religious discrimination.[5] Moreover, some of the statements are attributable to parents, not to Epiphany. As for statements attributable to Epiphany, even viewing the evidence in the light most favorable to Benjamin, no rational jury could find that Epiphany allegedly terminated Benjamin because of his Jewish or Quaker religion. See Reeves, 530 U.S. at 148–49; Holland, 487 F.3d at 216–18; Laber, 438 F.3d at 430–31; Broadway, 2018 WL 542666, at *5. Accordingly, the court grants Epiphany's motion for summary judgment on count three.

E.

In count four, Benjamin alleges that Epiphany discriminated against him because of his Jewish race in violation of Title VII. See Am. Compl. ¶¶ 134–38. The court assumes without deciding that Benjamin can state a claim for race discrimination on the basis of his Jewish race under Title VII. See Village of Freeport v. Barrella, 814 F.3d 594, 606–07 (2d Cir. 2016); Krulik v. Bd. of Educ., 781 F.2d 15, 21–22 (2d Cir. 1986); Bonadona v. La. Coll., No. 18-cv-224, 2018 WL 4353979, at *3–5 (W.D. La. July 13, 2018) (unpublished); cf. T.E. v. Pine Bush Cent. Sch. Dist., 58 F. Supp. 3d 332, 354–55 (S.D.N.Y. 2014); Doran v. N.Y. State Dep't of Health Office of Medicaid Inspector Gen., No. 15-cv-7217, 2017 WL 836027, at *12 n.3 (S.D.N.Y. Mar. 2, 2017) (unpublished). The same analysis applies to Benjamin's race discrimination claim under section 1981 and his race discrimination claim under Title VII. See, e.g., Humphries, 553 U.S. at 455. Just as Benjamin's race discrimination claim fails under section 1981, his Title VII race discrimination

---

[5] For example, Sparks did not label Benjamin a "threat to our Christian traditions." See [D.E. 176] 8, 22. Instead, Sparks said that, in addition to ten other possible grounds for concerns, Epiphany parents and faculty may have concerns with "threats to our Christian traditions/lack of a Chaplain/changes at Chapel, etc." [D.E. 172-20].

claim also fails. Accordingly, the court grants Epiphany's motion for summary judgment on count four.

F.

In count six, Benjamin alleges that Epiphany terminated him because of a perceived disability in violation of the ADA. See Am. Compl. ¶¶ 144–48. The ADA forbids employers from discriminating against persons with disabilities. See 42 U.S.C. § 12112(a)–(b); Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 430 (4th Cir. 2015). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1). Section 12102(3), in turn, states:

> For purposes of paragraph (1)(C):
>
> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>
> (B) Paragraph 1(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

Under section 12102(3), which Congress added in the ADAAA, an individual bringing a "regarded as" claim need only show that an employer subjected him to an action that the ADA prohibits because of an actual or perceived impairment regardless of whether the employer perceived the impairment to limit the individual in a major life activity. See 42 U.S.C. § 12102(3); 29 C.F.R. § 1630.2(1)(1); Olsen v. Capital Region Med. Ctr., 713 F.3d 1149, 1154 (8th Cir. 2013); Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321–23 (6th Cir. 2012); Harris v. Reston Hosp.

29

Ctr., LLC, No. 1:10-cv-1431, 2012 WL 1080990, at \*4–5 (E.D. Va. Mar. 26, 2012) (unpublished). Thus, a "regarded as" claim under the ADAAA is much easier to prove than a "regarded as" claim before the ADAAA. Cf. Young v. United Parcel Serv., Inc., 707 F.3d 437, 443–44 (4th Cir. 2013) (analyzing a pre-ADAAA "regarded as" claim); Rohan v. Networks Presentations LLC, 375 F.3d 266, 277–78 (4th Cir. 2004) (same); Pollard v. High's of Balt., Inc., 281 F.3d 462, 471 n.5 (4th Cir. 2002) (same); Davis v. Univ. of N.C., 263 F.3d 95, 99–100 (4th Cir. 2001) (same); Rhoads v. F.D.I.C., 257 F.3d 373, 390–91 (4th Cir. 2001) (same); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 703 (4th Cir. 2001) (same).

Benjamin maintains that he is not, in fact, disabled. See Am. Compl. ¶ 81. Instead, he argues that Epiphany perceived Benjamin as disabled. See id. ¶¶ 144–48; [D.E. 176] 17. In support, Benjamin notes several conversations that Sparks had concerning Benjamin's mental health. See [D.E. 132] ¶ 61. For example, Sparks told an Epiphany parent that "he had to terminate Mr. Benjamin because Mr. Benjamin had dementia and bipolar disease." [D.E. 172-14] (declaration of Renee Coles); [D.E. 143-33] ¶ 29. In addition, Sparks discussed Benjamin's alleged resignation with Dueck in an e-mail. See [D.E. 142-17]. After describing Benjamin's mental health, Sparks concluded by saying that he hoped that Dueck "underst[ood] why we had to ask for [Benjamin's] resignation." Id.

The cited testimony constitutes direct evidence of disability discrimination by a decisionmaker on the basis of Benjamin's perceived mental impairment. See Reeves, 530 U.S. at 141, 152–53; Hill, 354 F.3d at 284; Cherry, 147 F. Supp. 3d at 421–22. Moreover, the comments "illustrate a nexus between [Sparks's] negative attitude and the employment action." Rayyan v. Va. Dep't of Transp., 719 F. App'x 198, 202 (4th Cir. 2018) (per curiam) (unpublished); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999), abrogated on other grounds by Desert

30

Palace, Inc. v. Costa, 539 U.S. 90. Although a decisionmaker's isolated stray remark is insufficient to survive a motion for summary judgment, Sparks's statements are directly related to Epiphany's decision to allegedly terminate Benjamin's employment. See Hill, 354 F.3d at 286; Wagner v. Dillard Dep't Stores, Inc., 17 F. App'x 141, 147–48 (4th Cir. 2001) (per curiam) (unpublished); cf. Martin v. Alumax of S.C., Inc., 380 F. Supp. 2d 723, 727–29 (D.S.C. 2005). Therefore, the court denies Epiphany's motion for summary judgment on Benjamin's ADA claim.

In reaching this conclusion, the court acknowledges Epiphany's discussion of the after-acquired evidence doctrine. See McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 360–63 (1995). "An after-acquired evidence defense limits an employer's liability when the employer discovers evidence of wrongdoing of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." Dotson v. Pfizer, Inc., 558 F.3d 284, 298 (4th Cir. 2009) (quotation and alteration omitted); see McKennon, 513 U.S. at 362–63; Russell v. Microdyne Corp., 65 F.3d 1229, 1235–38 (4th Cir. 1995). Once an employer shows that the employee committed sufficiently severe wrongdoing, the trial court determines the employee's remedy by calculating backpay "from the date of the unlawful discharge to the date the new information was discovered." McKennon, 513 U.S. at 362; see Russell, 65 F.3d at 1238; EEOC v. Triangle Catering, LLC, No. 5:15-CV-16-FL, 2017 WL 818261, at *11 (E.D.N.C. Mar. 1, 2017) (unpublished).

Epiphany claims that Benjamin materially misrepresented his qualifications in his CV and has substantial evidence to support that claim. See [D.E. 132] ¶¶ 63–75; cf. [D.E. 149] ¶¶ 27–77. Although after-acquired evidence of wrongdoing cannot defeat a plaintiff's discrimination claim, see McKennon, 513 U.S. at 360–63; Penn v. Aerospace Corp., No. 1:08cv620 (ATJ/TRJ), 2009 WL 585839, at *8 (E.D. Va. Mar. 6, 2009) (unpublished), such evidence can limit the amount of backpay

31

and defeat an award of front pay. Genuine issues of material fact exist concerning the after-acquired evidence doctrine in this case. See O'Neal v. City of New Albany, 293 F.3d 998, 1003–04 (7th Cir. 2002). Thus, this issue will be addressed at trial.

G.

In count seven, Benjamin alleges that Epiphany retaliated against him in violation of Title VII. See Am. Compl. ¶¶ 149–53. Benjamin alleges that Epiphany took adverse actions against him—including terminating his employment, subjecting him to disparate working conditions, and forcing him and his family out of their home—because Benjamin complained about Epiphany's unlawful employment practices. See id. ¶ 150. The elements of a Title VII retaliation claim are the same as under section 1981 except that the protected activity has to concern alleged violations of Title VII. See Humphries, 553 U.S. at 454–55; Boyer-Liberto, 786 F.3d at 281; Aleman v. Chugach Support Servs., Inc., 485 F.3d 206, 212–14 (4th Cir. 2007); Bryant, 333 F.3d at 543. Benjamin alleges no direct evidence of retaliation and relies on the burden-shifting framework.

As for Benjamin's prima facie case, Benjamin cannot show that he engaged in protected activity under Title VII. Benjamin could not have reasonably believed that Epiphany's employment practices were unlawful, and Benjamin's advocacy for student, faculty, and staff diversity is not a protected activity under Title VII. See DeMasters, 796 F.3d at 416–20 (discussing Title VII's opposition clause); Stennis, 716 F. App'x at 166–67; Montgomery, 2012 WL 3903784, at *9–10; Byerly v. Ithaca Coll., 290 F. Supp. 2d 301, 309 & n.13 (N.D.N.Y. 2003); cf. Nelson v. Bank of Am., Inc., No. 302CV687L, 2004 WL 942238, at *11–12 (N.D. Tex. Apr. 30, 2004) (unpublished). Alternatively, Benjamin cannot show causation due to the time gap between Benjamin starting his diversity initiative and Epiphany allegedly terminating Benjamin's employment. See Breeden, 532 U.S. at 273–74; Perry, 489 F. App'x at 643; Dowe, 145 F.3d at 657; Drago, 453 F.3d at 1308;

32

<u>Richmond</u>, 120 F.3d at 209. Therefore, Benjamin has failed to prove a prima facie case of retaliation under Title VII.

Alternatively, even if Benjamin could establish a prima facie case, Epiphany had a legitimate, non-retaliatory reason for allegedly terminating Benjamin's employment. Moreover, Benjamin has not raised a genuine issue of material fact concerning whether Epiphany terminated his employment because of his alleged protected activity under Title VII. <u>See, e.g.</u>, <u>Reeves</u>, 530 U.S. at 148–49; <u>Holland</u>, 487 F.3d 216–18; <u>Laber</u>, 438 F.3d at 430–31. Accordingly, the court grants Epiphany's motion for summary judgment on count seven.

## III.

### A.

In counts eight and nine, Benjamin alleges that Epiphany and the Foundation breached their contracts with Benjamin by terminating the contracts without cause. <u>See</u> Am. Compl. ¶¶ 154–63. Both the Epiphany and the Foundation seek summary judgment, alleging that Benjamin resigned or, in the alternative, that Benjamin would have been fired for cause had he not resigned. <u>See</u> [D.E. 217] ¶¶ 49–51, 57; [D.E. 223] ¶¶ 199–202, 207–210, 217, 239, 242–43.

North Carolina law governs both the independent contractor agreement with the Foundation and the employment contract with Epiphany. <u>See</u> [D.E. 141-12] 4; [D.E. 141-13] 7. Under North Carolina law, a breach-of-contract claim involves two elements: (1) the existence of a valid contract and (2) breach of the terms of that contract. <u>McLamb v. T.P. Inc.</u>, 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005); <u>Poor v. Hill</u>, 138 N.C. App. 19, 26, 530 S.E.2d 838, 845 (2000). A breach of a contract occurs where there is "'[n]on-performance[,] . . . unless the person charged . . . shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him.'" <u>Cater v. Barker</u>, 172 N.C. App. 441, 447, 617 S.E.2d 113, 117 (2005), <u>aff'd</u>, 360 N.C. 357,

33

625 S.E.2d 778 (2006) (quoting Blount-Midyette v. Aeroglide Corp., 254 N.C. 484, 488, 119 S.E.2d

225, 228 (1961)).

As for Benjamin's breach of contract claim against Epiphany in count eight, section 7 of

Benjamin's employment contract with Epiphany governed termination.[6] First, if Benjamin resigned

---

[6] The employment agreement contains the following definitions:

a.     Resignation. Resignation by the Head of School shall mean any voluntary resignation or retirement by the Head of School. The Head of School is required to give at least six (6) months' advance written notice of resignation or retirement to Epiphany, and Epiphany is entitled upon receiving such notice, in its discretion, to accept such resignation as effective on: (1) the resignation date proposed by the Head of School, or (2) such other earlier date designated by Epiphany if that date is within the six month period proposed by the Head of School. Epiphany will be required to pay the Head of School his regular salary and benefits through Head of School's stated resignation date, regardless of whether the Head of School is actually permitted to perform any services for Epiphany during that period. If Head of School does provide at least six (6) months' advance notice of resignation or retirement and if Head of School fulfills his duties in good faith during the six (6) month notice period (or for a lesser period if so designated by the Board as mentioned above), Epiphany shall pay Head of School the equivalent of one (1) month of his then-current salary, less normal deductions and withholdings, in severance pay. If Head of School does not provide at least six (6) months' advance notice of his resignation or retirement or if he does not fulfill his duties during his notice period, then he forfeits any entitlement to any severance pay.

b.     Termination for Cause. "Termination for Cause" means termination of the employment of the Head of School (which can be immediate except as provided below) as the result of: (1) an act or acts by the Head of School, or any omission by the Head of School, constituting a crime (with the exception of minor traffic violations); or (2) commission or omission by the Head of School of any act of fraud or dishonesty by the Head of School in connection with the Head of School's employment with Epiphany; or (3) misappropriation by the Head of School of funds or property of Epiphany or its employees; or (4) gross or willful misconduct by the Head of School resulting in damages to the reputation or operation of Epiphany; or (5) drug or alcohol addition or abuse by the Head of School; (6) intentional actions by the Head of School which he knows or should have known are detrimental to the "Four Pillars" of Epiphany's foundation, or (7) the material breach of any provision of this Agreement by Head of School; or (8) insubordination by or the refusal of Head of School to follow specific lawful instructions given by the Board. Prior to Epiphany terminating Head of School's employment for cause under items 4, 6, 7 or

34

as headmaster, he would forfeit "any entitlement to any severance pay." [D.E. 141-13] 6. Second,

Benjamin could be terminated for cause immediately for "any act of fraud or dishonesty . . . in

connection with [Benjamin's] employment with Epiphany." Id. The contract provides other grounds

for termination for cause, including "gross and willful misconduct by the [headmaster] resulting in

damage to the reputation or operation of Epiphany," intentionally violating Epiphany's "Four

Pillars," materially breaching the employment contract, and insubordination, but the contract requires

that Benjamin be given notice and thirty days to cure any "material breach or offending behavior."

Id. Finally, Benjamin could be terminated without cause "for any reason other than death, disability,

non-renewal of [the employment contract], or [termination for cause]." Id. If terminated without

---

8 in the preceding sentence, the Board must give Head of School thirty (30) days written notice with the opportunity to cure the material breach or offending behavior specifically identifying the material breach or offending behavior and options to effectuate a cure to Employee (if such material breach or offending behavior is capable of being cured). Provided, however, if the material breach or offending behavior relates to Head of School performing or completing a directive from the Board which cannot reasonably be performed or completed within thirty (30) days after such written notice, then, provided Head of School begins taking appropriate steps to perform or complete such directive and diligently pursues performance or completion of such directive within the thirty (30) day period, Head of School shall have a reasonable period of time within which to cure such material breach or offending behavior. Benjamin will not be entitled to any severance if Epiphany terminates him for cause under Paragraph 7(b).

c. Termination without Cause. For purposes of this Agreement, ["]Termination without Cause" shall mean any termination of the employment of the Head of School by Epiphany for any reason other than death, disability, non-renewal of this Agreement, or "Termination for Cause." The Board can terminate the Head of School at any time without Cause, but Epiphany will be obligated to pay Head of School for the remainder of the Term of this Agreement (or the remainder of any extended term). In addition to paying Head of School for the remainder of the Term of this Agreement if he is terminated without cause, Epiphany will pay Head of School one (1) additional year of his then-current base salary if the Board terminates Head of School without cause during Term of this Agreement or any extended term.

[D.E. 141-13] 5–6.

cause during the term of his contract, Benjamin would be paid the remainder of his contract plus one additional year. Id.

As for Benjamin's breach of contract claim against the Foundation, Benjamin's independent contractor agreement with the Foundation stated: "Foundation may cancel this agreement upon thirty (30) days written notice to Benjamin for any reason. In the event that cancellation occurs . . . for any reason other than . . . any act or acts of fraud or dishonesty by Benjamin . . . the Foundation shall continue Benjamin's compensation for one calendar year following the date of cancellation." [D.E. 141-12] 3.

Epiphany and the Foundation contend that they did not terminate's Benjamin's contract, but that Benjamin voluntarily resigned. See [D.E. 133] 25–26; [D.E. 150] 8–9; [D.E. 188] 9–10. Alternatively, Epiphany and the Foundation contend that even if Benjamin did not resign, Epiphany and the Foundation had multiple reasons to terminate Benjamin for cause: (1) misrepresentation of time spent at the lower campus; (2) statements concerning involvement in LGBT club; (3) denial of statements calling members of Epiphany community "racists and bigots"; and (4) misrepresentation of qualifications. See [D.E. 150] 10–12; [D.E. 133] 27–29; [D.E. 132] ¶¶ 45–46.

The contracts are valid. As for breach, Benjamin has raised a genuine issue of material fact concerning whether his resignation was voluntary or whether he was terminated by Epiphany and the Foundation. See, e.g., Spring, 2017 WL 432789, at *2–3; Johnson v. Colonial Life & Accident Ins. Co., 173 N.C. App. 365, 369–70, 618 S.E.2d 867, 870–71 (2005). A rational jury could conclude that, during the November 21, 2013, meeting, Epiphany and the Foundation terminated Benjamin and forced him to draft and sign a resignation letter.

Assuming that a jury finds that Benjamin did not resign, genuine issues of material fact exist. Epiphany could terminate the contract immediately for any act of fraud or dishonesty. Likewise, the

36

Foundation could terminate the contract immediately for fraud or dishonesty. Genuine issues of material fact exist concerning whether Benjamin engaged in an act of fraud or dishonesty sufficient to terminate either contract. In addition, the court assumes without deciding that Benjamin's alleged misrepresentations on his CV, if proven, would provide cause to terminate the contracts, but Epiphany and the Foundation did not know of the alleged misrepresentations on November 21.[7] Accordingly, the court denies Epiphany's motion for summary judgment on count eight and denies the Foundation's motion for summary judgment on count nine.

## B.

In counts ten and eleven, Benjamin alleges that Sparks defamed him per se, or in the alternative, defamed him per quod. See Am. Compl. ¶¶ 164–80. Benjamin identifies the following statements of Sparks: (1) an oral statement to Plihcik, a recruiter for the firm Carney Sandoe who initially recommended Benjamin for the position at Epiphany, in which Sparks said that "he thought Saul was insane . . . [and] that he may have had a stroke or something" and that Benjamin was no longer the man that Sparks had hired, [D.E. 172-10] 7; see [D.E. 170] ¶ 479; (2) an oral statement to Epiphany's Board that Sparks "may be suffering from dementia or Alzheimer's or something along those lines," [D.E. 172-8] 8; see [D.E. 170] ¶ 478; (3) an oral statement to Epiphany parent

---

[7] The after-acquired evidence doctrine and analogous North Carolina contract remedies also can affect Benjamin's breach of contract claims. Cf. Johnson v. Bd. of Trs. of Durham Tech. Cmty. Coll., 157 N.C. App. 38, 48–49, 577 S.E.2d 670, 676 (2003) ("If an employer can show that its discovery of the employee's pre-discharge misconduct was inevitable and independent of its employment decision, back pay shall be limited to the time between the discharge and the time of discovery."); Rinaldi v. CCX, Inc., No. 3:05-CV-108-RJC, 2008 WL 2622971, at *7 (W.D.N.C. July 2, 2008) (unpublished); Tooker v. Medex, Inc., No. 5:04-CV-2-H(2), 2005 WL 8131636, at *4 (E.D.N.C. July 13, 2005) (unpublished); cf. O'Day v. McDonnell Douglas Helicopter Co., 191 Ariz. 535, 538–39, 959 P.2d 792, 795–96 (1998) (en banc) ("The overwhelming majority of courts hold that if an employer can demonstrate that it would have fired an employee had it known of prior misconduct, then the employee's claim for breach of contract is barred or, put differently, the prior misconduct excuses the employer's breach.").

37

Renee Coles and her husband in which Sparks said that "he had to terminate Mr. Benjamin because Mr. Benjamin had dementia and bipolar disease" and that "bipolar disease runs in Benjamin's family," [D.E. 143-32] ¶ 24; see [D.E. 143-33] ¶ 29; [D.E. 170] ¶ 480; and (4) a series of communications, both written and oral, to Dueck in which Sparks asserted that Benjamin was suffering from a mental illness. See [D.E. 170] ¶¶ 473–77.

To establish a defamation claim, a "plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation." Griffin v. Holden, 180 N.C. App. 129, 133, 636 S.E.2d 298, 302 (2006) (quotation omitted); see Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 316–19, 312 S.E.2d 405, 408–10 (1984); Boyce & Isley, PLLC v. Cooper, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011); Craven v. Cope, 188 N.C. App. 814, 816, 656 S.E.2d 729, 732 (2008); Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 356, 595 S.E.2d 778, 783 (2004). A defamatory statement is one that "tend[s] to prejudice another in his reputation, office, trade, business, or means of livelihood." Donovan v. Fiumara, 114 N.C. App. 524, 526, 442 S.E.2d 572, 574 (1994); see West v. King's Dep't Store, Inc., 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1998). Defamation includes two torts: libel and slander. See, e.g., Craven, 188 N.C. App. at 816, 656 S.E.2d at 732; Tallent v. Blake, 57 N.C. App. 249, 251, 291 S.E.2d 336, 338 (1982); cf. Renwick, 310 N.C. at 323–24, 312 S.E.2d at 412–13. Generally, libel is written and slander is oral. See Bell v. Simmons, 247 N.C. 488, 494, 101 S.E.2d 383, 387 (1958); Aycock v. Padgett, 134 N.C. App. 164, 165, 516 S.E.2d 907, 909 (1999).

Under North Carolina law, a claim of slander per se has three elements: "(1) defendant spoke base or defamatory words which tended to prejudice [plaintiff] in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule, or contempt; (2) the statement

38

was false; and (3) the statement was published or communicated to and understood by a third person." West, 321 N.C. at 703, 365 S.E.2d at 624; Friel v. Angell Care Inc., 113 N.C. App. 505, 509, 440 S.E.2d 111, 113–14 (1994); see Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 29–30, 568 S.E.2d 893, 898 (2002). Libel per se is a false written statement communicated to a third party which, in relevant part here, "tends to impeach a person in that person's trade or profession [or] otherwise tends to subject one to ridicule, contempt or disgrace." Renwick, 310 N.C. at 317, 312 S.E.2d at 408–09; see Flake v. Greensboro News Co., 212 N.C. 780, 782, 195 S.E. 55, 59–60 (1938); Cherry v. United Parcel Serv., Inc., No. 5:07-CV-403-D, 2009 WL 8641019, at *9 (E.D.N.C. Sept. 28, 2009) (unpublished).

Whether a statement is defamatory per se is a question of law. See, e.g., Ellis v. N. Star Co., 326 N.C. 219, 224, 388 S.E.2d 127, 130 (1990). When a plaintiff alleges that statements are defamatory per se, the statements "must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." Boyce & Isley, PLLC, 153 N.C. App. at 30–31, 568 S.E.2d at 898–99. In making this determination, the court considers the statement alone without any explanatory circumstances, insinuations, innuendo, or colloquium. See, e.g., Nucor Corp. v. Prudential Equity Grp., LLC, 189 N.C. App. 731, 736, 659 S.E.2d 483, 487 (2008). A "pure expression of opinion" is not actionable under North Carolina law. See id. at 736, 659 S.E.2d at 486; Daniels v. Metro Magazine Holding Co., LLC, 179 N.C. App. 533, 539–40, 634 S.E.2d 586, 590 (2006). Nevertheless, "someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability." Nucor Corp., 189 N.C. App. at 736, 659 S.E.2d at 486; see Milkovich v. Lorain Journal Co., 497 U.S. 1, 19–20 (1990); Design Res., Inc. v. Leather Indus. of Am., 789 F.3d 495, 504–05 (4th Cir. 2015). In cases of

39

defamation per se, damages and malice are presumed. See Donovan, 114 N.C. App. at 527, 442 S.E.2d at 574.

Viewing the record in the light most favorable to Benjamin, Benjamin has presented sufficient evidence concerning whether Sparks's statements were false and whether Sparks communicated to and was understood by third parties. At issue is whether Sparks's statements prejudiced Benjamin in his reputation, office, trade, business or means of livelihood or held him up to disgrace, ridicule, or contempt.

In Badame v. Lampke, the Supreme Court of North Carolina held that "false words imputing to a merchant or business man conduct derogatory to his character and standing as a business man and tending to prejudice him in his business are actionable." 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955); see Boyce & Isley, PLLC, 153 N.C. App. at 30, 568 S.E.2d at 898. To be actionable per se, "the false words (1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business. That is to say, it is not enough that the words used tend to injure a person in his business. To be actionable per se, they must be uttered of him in his business relation." Badame, 242 N.C. at 757, 89 S.E.2d at 468; see Boyce & Isley, PLLC, 153 N.C. App. at 30, 568 S.E.2d at 898; Gibson v. Mut. Life Ins. Co., 121 N.C. App. 284, 289, 465 S.E.2d 56, 60 (1996); Clark v. Brown, 99 N.C. App. 255, 260–61, 393 S.E.2d 134, 137 (1990); Spirax Sarco, Inc. v. SSI Eng'g, Inc., 122 F. Supp. 3d 408, 435 (E.D.N.C. 2015); Greensboro Scuba Sch., LLC v. Robertson, No. COA 14-1126, 2015 WL 4429665, at *3 (N.C. Ct. App. July 21, 2015) (unpublished table decision).

Courts applying North Carolina law have found to be defamatory per se as prejudicing a plaintiff's business or professional reputation, inter alia, (1) statements implying or asserting that a plaintiff is incompetent or incapable of performing a job, see Clark, 99 N.C. App. at 261, 393 S.E.2d

40

at 137; Dynamic Campus Sols., Inc. v. Pfeiffer Univ., No. 1:17-cv-906, 2018 WL 2248534, at *4 (M.D.N.C. Apr. 20, 2018) (unpublished); (2) statements implying or asserting that a plaintiff engages in improper business practices, see Ellis, 326 N.C. at 223–25, 388 S.E.2d at 129–31; Broadway v. Cope, 208 N.C. 85, 88–89, 179 S.E. 452, 454–55 (1935); Boyce & Isley, PLLC, 153 N.C. App. at 32, 568 S.E.2d at 899–900; Ausley v. Bishop, 133 N.C. App. 210, 214–15, 515 S.E.2d 72, 75–76 (1999); and (3) statements implying or asserting that a plaintiff engaged in illegal activity, see, e.g., Talbert v. Mauney, 80 N.C. App. 477, 480–81, 343 S.E.2d 5, 8 (1986). Cf. Ellis, 326 N.C. at 229–30, 388 S.E.2d at 133–34 (Meyer, J., dissenting) (collecting cases). By contrast, statements that merely call a plaintiff dishonest or an "untruthful and . . . unreliable employee" are not actionable per se. See Pierce v. Atl. Grp., Inc., 219 N.C. App. 19, 35, 724 S.E.2d 568, 579 (2012); Stutts v. Duke Power Co., 47 N.C. App. 76, 82, 266 S.E.2d 861, 865 (1980); cf. Morris v. Bruney, 78 N.C. App. 668, 673–677, 338 S.E.2d 561, 564–566 (1986). Moreover, statements that are innocuous on their face are not actionable per se. See Greensboro Scuba Sch., 2015 WL 4429665, at *4; Edwards v. Holden, No. COA 07-1454, 2008 WL 2967935, at *4 (N.C. Ct. App. Aug. 5, 2008) (unpublished table decision).

Here, a reasonable jury could find that at least some of Sparks's statements are assertions of fact that tend to prejudice Benjamin in his reputation and business. As for the statements to Coles, Plihcik, and the Board, Sparks did not merely call Benjamin dishonest or unreliable. He declared that Benjamin suffered from various mental illnesses that would make him unfit to lead a school again, and he communicated those statements to, among others, a recruiter that had recommended Benjamin to Epiphany's Board and other potential employers. Cf. Restatement (Second) of Torts § 573 cmt. c (Am. Law Inst. 1977) ("A, says to B that C, a merchant, is insane. A is subject to liability to C without proof of special harm."). Not only do Sparks's business-related statements

41

prejudice Benjamin, Sparks's statements concern Benjamin in his business as an educator. See Johnson v. Bollinger, 86 N.C. App. 1, 10, 356 S.E.2d 378, 384 (1987).

As for Sparks's statements to Dueck, the statements are personal and do not reflect on or relate to Benjamin as a professional. Therefore, those statements are not defamatory per se. See id.; cf. Milkovich, 497 U.S. at 17, 20; Spirax Sarco, Inc., 122 F. Supp. 3d at 434; Daniels, 179 N.C. App. at 542, 634 S.E.2d at 592.

Genuine issues of material fact exist concerning Sparks's statements to Coles, Plihcik, and the Board. Thus, the court denies Sparks's motion for summary judgment on count ten as to those statements. The court grants summary judgment to Sparks on count ten as to the statements he made to Dueck.

As for count eleven, Benjamin has not alleged or proven with particularity any special damages resulting from Sparks's statements to Dueck. Thus, the court grants summary judgment to Sparks on Benjamin's defamation per quod claim in count eleven. See, e.g., Gibson v. Mut. Life Ins. Co., 121 N.C. App. 284, 289, 465 S.E.2d 56, 59 (1996).

C.

In count fourteen, Benjamin alleges that Sparks falsely imprisoned him during the November 21, 2013, meeting. See Am. Compl. ¶¶ 69–87, 192–95. Specifically, Benjamin alleges that Sparks used threatening language, made threatening physical gestures, and prevented him from leaving the conference room or bringing others into the room. See [D.E. 170] ¶¶ 430–31, 433, 435, 437–42; [D.E. 172-1] 31–34, 36–39; [D.E. 172-7] 8–10. But see [D.E. 149] ¶¶ 203–39; [D.E. 172-3] 6.

Under North Carolina law, false imprisonment is the "illegal restraint of one's person against his will." Adams v. City of Raleigh, 245 N.C. App. 330, 334, 782 S.E.2d 108, 112 (2016); see Black v. Clark's Greensboro, Inc., 263 N.C. 226, 228, 139 S.E.2d 199, 201 (1964); Wilkerson v. Duke

42

Univ., 229 N.C. App. 670, 674, 748 S.E.2d 154, 158 (2013); Hemric v. Groce, 169 N.C. App. 69, 78, 609 S.E.2d 276, 283 (2005). To prove false imprisonment, a plaintiff must show "(1) the illegal restraint of the plaintiff by defendant, (2) by force or implied threat of force . . . (3) against the plaintiff's will." Wilkerson, 229 N.C. App. at 674, 748 S.E.2d at 158.

Sparks told Benjamin during the meeting that if Benjamin left, he would be fired for cause. See [D.E. 168] 10–11. "The restraint that resulted simply from plaintiff's fear of losing his job is insufficient as a matter of law to make out a claim of false imprisonment." Johnson v. United Parcel Servs., Inc., 722 F. Supp. 1282, 1284–85 (D. Md. 1989). Even viewing the evidence in the light most favorable to Benjamin, no rational jury could find that Sparks falsely imprisoned Benjamin. Accordingly, the court grants Sparks's motion for summary judgment on count fourteen.

D.

In count fifteen, Benjamin alleges an assault claim against Sparks. See Am. Compl. ¶¶ 196–99. Benjamin has abandoned that claim because he failed to respond to Sparks's arguments concerning assault. See [D.E. 168]; cf. Feldman v. Law Enf't Assocs. Corp., 955 F. Supp. 2d 528, 536 (E.D.N.C. 2013); Yates v. Ford Motor Co., No. 5:12-CV-752-FL, 2015 WL 9222834, at *2 (E.D.N.C. Dec. 17, 2015) (unpublished); Davis v. Gregory Poole Equip. Co., No. 2:14-CV-12-BO, 2015 WL 8484261, at *5 (E.D.N.C. Dec. 8, 2015) (unpublished). Nonetheless, the court has reviewed the record. The court grants Sparks's motion for summary judgment on count fifteen.

IV.

In sum, the court enters this order to explain why the court granted in part and denied in part Epiphany's motion for summary judgment [D.E. 131], granted in part and denied in part the Foundation's motion for summary judgment [D.E. 139], and granted in part and denied in part Sparks's motion for summary judgment [D.E. 140]. Not later than November 5, 2018, the parties

43

shall advise the court whether they desire a court-hosted settlement conference with Magistrate Judge

Gates. Not later than November 19, 2018, the parties also shall confer and propose trial dates for

February or March 2019. The proposal shall include an estimate of the trial length.

SO ORDERED. This **29** day of October 2018.

JAMES C. DEVER III
United States District Judge

44